[No. A117128. First Dist., Div. One. Aug. 11, 2008.]

DAVID MADDEN, Plaintiff and Appellant, v.
SUMMIT VIEW, INC., Defendant and Respondent.

COUNSEL

Oreck & Oreck, Eugene R. Oreck; Paoli & Geerhart and Thomas Alan Paoli for Plaintiff and Appellant.

Archer Norris, William H. Staples, W. Eric Blumhardt and Kimberly M. Amick for Defendant and Respondent.

OPINION

**MARGULIES, J.**—Plaintiff David Madden was injured when he fell from a raised patio while working for a subcontractor at a home construction site. He sued the general contractor, Summit View, Inc. (Summit View), alleging that his injuries were caused by Summit View's negligence in failing to place a protective railing along the open side of the patio. Summit View moved successfully for summary judgment under the *Privette-Toland* doctrine. (*Privette v. Superior Court* (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721] (*Privette*); *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 [74 Cal.Rptr.2d 878, 955 P.2d 504] (*Toland*).) Madden contends that the trial court erred in finding there were no triable issues of material fact. We affirm.

## I. BACKGROUND

### A. *Pleadings*

Madden, an electrician employed by a subcontractor at a home construction site, sued Summit View, the general contractor, for injuries he sustained on July 1, 2003, in a fall from a raised unenclosed patio at the site. Madden's form complaint asserted a single cause of action for premises liability against Summit View, based on the allegation that his injuries were proximately caused by Summit View's negligence in maintaining, managing, and operating the subject premises. Summit View's answer included an affirmative defense based on *Privette* and *Toland*.

### B. *Summary Judgment Motion*

By motion for summary judgment, Summit View asserted that it was entitled to judgment as a matter of law under the *Privette-Toland* line of cases, based in substance on the following undisputed facts:

Busch Electric was working as a subcontractor on the construction of a home for a Mr. and Mrs. Welsh, and Madden was employed as Busch's electrical foreman for the project. Summit View was the general contractor.

Under a subcontract between Summit View and Gary Tschantz Construction, Gary Tschantz was the project supervisor. However, Madden sequenced and directed his own work at the Welsh project. Summit View did not control the methods Busch used for its work nor did it control the method or means or provide any materials for Madden's work.

Madden was injured when he fell from a raised patio while pulling some electrical wire for installation in the home. He had worked in the area where the fall occurred many times before. Madden left the area of the installation and was walking backwards in an effort to untangle a knot of wire when the fall occurred. There were no witnesses to the fall. Madden does not know how high off the ground he was at the time of the fall.

In opposition to Summit View's motion, Madden cited the following facts, among others, that he contended were undisputed and created triable issues of material fact regarding Summit View's *Privette-Toland* defense:

A Summit View officer, Tom Berry, was at the project site two or three times a week, while Tschantz was there just about every day. Tschantz did not consider jobsite safety to be part of his work as project supervisor and that subject was never discussed with him. Tschantz was unaware that anybody at the jobsite had been hired by the Summit View representative to be responsible for site safety. Tschantz was not familiar with California Occupational Safety and Health Act (Cal-OSHA) regulations relating to fall protection, which required railings to be provided on all unprotected and open sides of elevated platforms or other elevations of seven and one-half feet or more.

The elevated patio was about eight feet wide, 30 to 40 feet in length, and between two and eight feet high, depending on the slope of the land that ran adjacent to it. About a year before the accident, a subcontractor had built the retaining wall for the patio, but the patio floor remained covered with dirt until June 2003, when the patio was cemented over. Between the time the retaining wall was built and patio was cemented over, the patio was used as a walkway and platform for workers on the project, including Tschantz, Berry, and Madden. No railing was put in place along the unprotected retaining wall side of the patio until after Madden's accident. Tschantz would have required Summit View's approval to install a railing.

The trial court granted summary judgment to Summit View, and this timely appeal followed.

## II. DISCUSSION

### A. *Standard of Review*

On appeal after a trial court has granted summary judgment, we review the record de novo to determine whether the evidence submitted for and against the motion discloses material factual issues warranting a trial. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334–335 & fn. 7 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

Summary judgment is properly granted when no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment bears the initial burden of showing that a cause of action has no merit by showing that one or more of its elements cannot be established or that there is a complete defense. (Code Civ. Proc., § 437c, subds. (a), (*o*)(2).) Once the defendant has met that burden, the burden shifts to the plaintiff "to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.)

### B. *The* Privette-Toland *Doctrine*

Defendant brought its motion for summary judgment on the theory that Madden's suit is barred as a matter of law by *Privette* and its progeny, a series of cases that have defined and limited the circumstances in which an independent contractor's employee may recover in tort from the party hiring the contractor. In *Privette*, the Supreme Court examined whether a hired contractor's employees may seek recovery based on the theory of "peculiar risk" from a nonnegligent hiring party for injuries caused by the negligent contractor. (*Privette, supra*, 5 Cal.4th at p. 696.) The peculiar risk doctrine had developed as an exception to the general rule that a person who hired an independent contractor was not liable to third parties for injuries caused by the contractor's negligence in performing the work. (*Id.* at p. 693.) It had been applied by the courts when the contracted work was deemed to pose some inherent risk of injury to others. (*Id.* at pp. 693–694.) The theory underlying the exception was that a private landowner who engages in inherently dangerous activity on his land should not be able to insulate himself from liability for injuries to others simply by hiring an independent

contractor to do the work. (*Ibid.*) In the event of the contractor's insolvency, the peculiar risk exception would allocate the loss to the person for whose benefit the job was undertaken. (*Id.* at p. 694.) By spreading the risk of loss to the person who primarily benefited from the hired work, the courts also sought to promote greater workplace safety. (*Ibid.*) The peculiar risk doctrine was gradually expanded to allow the hired contractor's *employees* to seek recovery from the nonnegligent property owner for injuries caused by the negligent contractor. (*Id.* at p. 696.)

■ The *Privette* court rejected the extension of the peculiar risk doctrine to the contractor's employees. The court reasoned that "when the person injured by negligently performed contracted work is one of the contractor's own employees, the injury is already compensable under the workers' compensation scheme and therefore the doctrine of peculiar risk should provide no tort remedy, for those same injuries, against the person who hired the independent contractor." (*Privette, supra,* 5 Cal.4th at p. 696.) Because the workers' compensation scheme shields an independent contractor from tort liability to its employees, "applying the peculiar risk doctrine to the independent contractor's employees would illogically and unfairly subject the hiring person, who did nothing to create the risk that caused the injury, to greater liability than that faced by the independent contractor whose negligence caused the employee's injury." (*Toland, supra,* 18 Cal.4th at p. 256 [summarizing the holding of *Privette*].) The scope of the *Privette* doctrine has been held to include claims that the hirer failed to take special precautions (*Toland,* at p. 267) and that the hirer was negligent in hiring the contractor whose negligence caused the injury (*Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1244–1245 [108 Cal.Rptr.2d 617, 25 P.3d 1096]).

■ In *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 200–202 [115 Cal.Rptr.2d 853, 38 P.3d 1081] (*Hooker*), the court considered whether the hirer of an independent contractor could be held liable for injuries to the contractor's employee resulting from the contractor's negligence under the theory that the hirer retained control of the work but negligently exercised that control.[1] The high court held in *Hooker* that "a hirer of an independent contractor was not liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but was liable to such an employee insofar as its exercise of

---

[1] This theory was based on section 414 of the Restatement Second of Torts, which provides in pertinent part: "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others . . . caused by his failure to exercise his control with reasonable care." (See *Kinney v. CSB Construction, Inc.* (2001) 87 Cal.App.4th 28, 32 [103 Cal.Rptr.2d 594] (*Kinney*).) According to the drafters, section 414 is typically applicable " 'when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job.' " (*Kinney,* at p. 32, quoting Rest.2d Torts, § 414, com. b, pp. 387–388.)

retained control *affirmatively contributed to the employee's injuries.*" (*Millard v. Biosources, Inc.* (2007) 156 Cal.App.4th 1338, 1348 [68 Cal.Rptr.3d 177] (*Millard*) [summarizing *Hooker*].) In such cases, the liability of the hirer is not "vicarious" or "derivative" in the sense that it derives from the act or omission of the hired contractor, but is direct. (*Hooker*, at p. 212; see also *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 222, 225 [115 Cal.Rptr.2d 868, 38 P.3d 1094] [hirer is directly liable to an employee of an independent contractor when hirer's provision of unsafe equipment affirmatively contributes to the employee's injury].)

In *Hooker*, the widow of a deceased crane operator who had been employed by a general contractor hired by the California Department of Transportation (Caltrans) to construct an overpass, sued Caltrans for negligently exercising its retained control over jobsite safety. (*Hooker, supra*, 27 Cal.4th at p. 202.) The Caltrans construction manual provided that Caltrans was responsible for obtaining the contractor's compliance with all safety laws and regulations, and Caltrans's onsite engineer had the power to shut the project down because of safety conditions and to remove employees of the contractor for failing to comply with safety regulations. (*Id.* at pp. 202–203.) The plaintiff's husband died after the crane tipped over when he attempted to operate it without reextending the crane's outriggers. (*Id.* at p. 202.) He had retracted the outriggers in order to allow Caltrans and other vehicles to use the narrow overpass. (*Id.* at p. 214.) The plaintiff alleged that Caltrans was negligent in permitting traffic to use the overpass while the crane was being operated. (*Id.* at pp. 202, 214–215.)

Although the court found that the plaintiff in *Hooker* had raised triable issues of material fact as to whether Caltrans retained control over safety conditions at the worksite, she failed to raise triable issues of material fact as to whether Caltrans actually exercised the retained control so as to affirmatively contribute to the death of her husband. (*Hooker, supra*, 27 Cal.4th at p. 202.) The court stated: " '[A] general contractor owes no duty of care to an employee of a subcontractor to prevent or correct unsafe procedures or practices to which the contractor did not contribute by direction, induced reliance, or other affirmative conduct. The mere failure to exercise a power to compel the subcontractor to adopt safer procedures does not, without more, violate any duty owed to the plaintiff.' " (*Id.* at p. 209.) Under the standard approved in *Hooker*, a general contractor contributes to an unsafe procedure or practice by its affirmative conduct where the general contractor " 'is actively involved in, or asserts control over, the manner of performance of the contracted work. [Citation.] Such an assertion of control occurs, for example, when the principal employer directs that the contracted work be done by use of a certain mode or otherwise interferes with the means and methods by which the work is to be accomplished. [Citations.]' [Citation.]" (*Id.* at p. 215, italics omitted.)

*Hooker* also states that an omission may constitute an affirmative contribution in some circumstances: "[A]ffirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Hooker, supra*, 27 Cal.4th at p. 212, fn. 3.)

Applying these standards to the facts before it, the *Hooker* court held: "While the evidence suggests that the crane tipped over because the crane operator swung the boom while the outriggers were retracted, and that the crane operator had a practice of retracting the outriggers to permit construction traffic to pass the crane on the overpass, *there was no evidence Caltrans's exercise of retained control over safety conditions at the worksite affirmatively contributed to the adoption of that practice by the crane operator. There was, at most, evidence that Caltrans's safety personnel were aware of an unsafe practice and failed to exercise the authority they retained to correct it.*" (*Hooker, supra*, 27 Cal.4th at p. 215, italics added.)

## C. The Trial Court Decision

The trial court granted Summit View's motion in explicit reliance on the analysis in *Hooker*. The court stated: "Although there is a triable issue as to whether [Summit View] retained control over general safety conditions at the site, no evidence was presented that would establish that [Summit View] affirmatively contributed, by direction, induced reliance or other affirmative conduct, to [Madden's] injuries. No evidence was presented that [Summit View] directed that a railing not be installed around the raised patio, nor that the presence or absence of such a railing was an issue that [Summit View] even considered prior to the incident. The absence of the railing was open and obvious, so there was no induced reliance. Under the circumstances of this case, [Summit View's] conduct was nothing more than a 'mere failure to exercise a power' to require the installation of a safety railing. As such, [Summit View] did not 'affirmatively contribute' to [Madden's] injuries."

## D. Analysis

In comparison to Caltrans's argument for summary judgment in *Hooker*, Summit View's claim here would seem to be at least as meritorious.

It was undisputed that Summit View was the general contractor and Madden was an employee of the subcontractor at the Welsh construction site. It was undisputed that Summit View had no control over the methods and supplied none of the materials that Madden's employer used for its electrical

work at the site. Consistent with the *Privette-Toland* line of cases, these facts were sufficient to shift the burden to Madden to produce evidence that Summit View nonetheless retained control over safety conditions and practices at the site, and that it contributed by its affirmative conduct to an unsafe condition or practice that caused Madden's injury.

### 1.  Retained Control

The evidence in *Hooker* showed that Caltrans retained significant control over safety conditions, as shown by the express reservation of control in its construction manual and by its placement of an engineer onsite with the power to punish subcontractors and their employees for noncompliance with safety requirements. (*Hooker, supra,* 27 Cal.4th at pp. 202–203.)[2] In contrast, Madden produced virtually no evidence here that Summit View retained control over general safety conditions at the Welsh site. Summit View entered into an oral contract for Tschantz to act as a "project supervisor." However, Tschantz did not understand his responsibilities to include jobsite safety, and that subject was not even discussed between him and Summit View. In addition, a Summit View representative was on the site every other day or so, but as far as Tschantz knew the representative did not have anyone present at the jobsite to do safety supervision. Thus, Madden's evidence showed only that Summit View "retained control" in the sense that, through Berry and Tschantz, it provided general supervision over the entire construction job. However, we will assume without deciding that a jury could reasonably infer from this general supervisory power that Summit View also retained control over safety conditions, whether it chose to exercise that control or not. (See Rest.2d Torts, § 414, com. b, pp. 387–388, quoted at fn. 1, *ante.*)

### 2.  Affirmative Conduct

Madden's theory is that his injury was proximately caused by the absence of a guardrail along the open side of the patio. Under *Hooker,* the issue is whether there is any evidence in the record that Summit View contributed to that condition by its affirmative conduct. Like the trial court, we find no such evidence.

First, there is no evidence that Summit View or its agents *directed* that no guardrailing or other protection against falls be placed along the raised patio,

---

[2] *Kinney,* a case cited with approval by the Supreme Court in *Hooker,* also upheld a summary judgment for a general contractor sued for on-the-job injuries suffered by a subcontractor's employee. In *Kinney,* the record also included extensive evidence that the general contractor had plenary authority over worksite safety under its contract with the site owner and that its site superintendent had a full right to intervene to correct any condition he deemed to be unsafe. (*Kinney, supra,* 87 Cal.App.4th at pp. 30–31.)

or that it acted in any way to *prevent* such a railing from being installed. Madden asserted as an undisputed fact that no railing was in place during the entire project until after his accident. Thus, there was no evidence that Summit View, Berry, or Tschantz removed or caused the removal of a safety guardrail. Madden also had no evidence that before his accident Summit View, Berry, or Tschantz ever participated in any discussion about placing a safety railing along the patio, became aware of any safety concern due to the lack of such a railing, or intervened in any way to prevent such a railing from being erected. Tschantz testified in deposition that if he had perceived a fall danger due to the raised patio he would probably have had to talk to Berry before putting up a guardrail, but there was simply no evidence that this hypothetical scenario ever arose or that Summit View made any promise or voluntarily assumed any duty to provide a guardrail.

Second, as the trial court pointed out, the absence of a guardrail was open and obvious to all of the contractors who worked at the site. Madden's evidence showed that the patio was used as a walkway and platform by the workers on the project, including himself, from the time the retaining wall was first built until the accident, and that no railing was ever in place. It was undisputed that Madden had worked in the area where the fall occurred many times before. Thus, as Busch Electric's onsite foreman, Madden was in as good a position as Summit View, Berry, or Tschantz to perceive that there was no guardrail along the raised patio to prevent a fall. There is no evidence whatsoever that Madden or Busch Electric were in any fashion induced to rely on the mistaken belief that Summit View had removed that hazard from the worksite.[3]

Third, there was no evidence that Summit View, Berry, or Tschantz directed Madden to perform his work in a manner that was especially dangerous due to the absence of a railing. It was undisputed that Madden directed his own work at the Welsh project and that Summit View had no involvement in the manner in which he performed the work or chose to uncoil the electrical wire that he was working with when the fall occurred. While Madden came forward with evidence that Summit View (along with Pacific Gas & Electric) may have had some input regarding the location of the electrical box he was working on at the time of the fall, the causal relationship between that decision and Madden's accident is far too remote to support an inference that Summit View's affirmative conduct contributed to the fall danger that ultimately materialized.

---

[3] The obviousness of the hazard does not in and of itself relieve Summit View of any duty it might have to eliminate it. (See *Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 122 [273 Cal.Rptr. 457].) It does, however, negate any claim by Madden that Summit View induced him to believe the hazard did not exist or that the hazard was otherwise concealed from him but known to Summit View.

The trial court aptly relied on *Hooker* as a benchmark for deciding the present case. Compared to Caltrans in the *Hooker* case, Summit View retained far less control over or responsibility for safety at the jobsite. Summit View also bore far less responsibility for the unsafe practice that led most immediately to Madden's injury—walking backward on a raised patio on a single occasion with no observers—than Caltrans bore for the crane operator's omission to extend the outriggers after he was made to repeatedly retract them in order to accommodate traffic Caltrans allowed on the overpass. Equally, the conduct for which Madden charges Summit View with liability—failing to install a guardrail—is, if anything, more passive than the conduct for which Caltrans was faulted in *Hooker*—forcing the crane operator to engage in the risky practice of retracting the outriggers to serve Caltrans's operational needs.

At oral argument, Madden's counsel stressed that this was a premises liability case governed by the principles of *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561], not a *Privette-Toland* case. As counsel acknowledged, however, *Privette-Toland* would apply unless only the general contractor would have had the authority to take reasonable safety precautions to alleviate the hazard. (See *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 673–674 [36 Cal.Rptr.3d 495, 123 P.3d 931].) Madden's evidence on this point was based on the testimony of a subcontractor Summit View hired to provide supervision at the site that (1) if he noticed a fall safety hazard, he would have needed to discuss constructing a guardrail with Summit View because he had no means of paying for it; and (2) his contract with Summit View did not include any money to build a retaining wall or a guardrail around the raised patio. But this evidence fails to establish that Madden's employer was powerless to take other reasonable safety precautions such as putting up a temporary barrier or cordon between the electrical panel and the edge of the patio while Madden was working in that location. Madden's premises liability claim is based on no more than a convenient assumption that his employer lacked the authority to take reasonable precautions to protect him from the kind of accident that occurred.

The trial court properly analyzed the facts and the applicable law to determine that there was no triable issue of material fact with regard to whether any affirmative conduct on Summit View's part contributed to the creation or persistence of the hazard causing Madden's injuries. (*Kinney, supra,* 87 Cal.App.4th at p. 30.)

### 3. *Effect of Cal-OSHA Regulations*

Relying on *Elsner v. Uveges* (2004) 34 Cal.4th 915 [22 Cal.Rptr.3d 530, 102 P.3d 915] (*Elsner*) and *Evard v. Southern California Edison* (2007) 153

Cal.App.4th 137 [62 Cal.Rptr.3d 479] (*Evard*), Madden argues that the Cal-OSHA regulations requiring railings to be placed on elevated platforms may be used to show that Summit View "affirmatively contributed" to his injury or otherwise had a duty of care to guard the raised patio. We do not agree.

■ *Elsner* held that under Labor Code section 6304.5, as amended in 1999,[4] "Cal-OSHA provisions are to be treated like any other statute or regulation and may be admitted to establish a standard or duty of care in all negligence and wrongful death actions, including third party actions." (*Elsner, supra*, 34 Cal.4th at p. 928.) However, in the course of determining that the amended Labor Code section 6304.5 could not be applied retroactively to the case before it, *Elsner* also found that the admission of Cal-OSHA provisions would not expand the defendant general contractor's common law duty of care toward the plaintiff employee of a subcontractor. (34 Cal.4th at p. 937.)

We agree with the Court of Appeal in *Millard, supra*, 156 Cal.App.4th 1338, which held that Labor Code section 6304.5, as construed in *Elsner*, did not in any way abrogate the *Privette-Toland* doctrine, nor expand a general contractor's duty of care to an injured employee of a subcontractor. (*Millard*, at p. 1352.) *Elsner* involved a suit by a roofing subcontractor's employee who had been injured at a construction project when scaffolding *constructed by the defendant general contractor* collapsed. (*Elsner, supra*, 34 Cal.4th at p. 924.) Thus, as *Millard* observed, *Privette* was not at issue in *Elsner* because the plaintiff was attempting to impose direct liability on the general contractor for its own affirmative conduct in providing unsafe equipment, not vicarious liability based on its failure to act. (*Millard*, at pp. 1350–1351.)

---

[4] The relevant text of Labor Code section 6304.5, as amended in 1999, with deletions in strikethrough and additions in italics is as follows: "It is the intent of the Legislature that the provisions of this division, *and the occupational safety and health standards and orders promulgated under this code, are* shall only be applicable to proceedings against employers brought pursuant to the provisions of Chapter 3 (commencing with Section 6500) and 4 (commencing with Section 6600) of Part 1 of this division for the exclusive purpose of maintaining and enforcing employee safety. [¶] Neither this division nor any part of this *the issuance of, or failure to issue, a citation by the* division shall have any application to, nor be considered in, nor be admissible into, evidence in any personal injury or wrongful death action arising after the operative date of this section, except as between an employee and his *or her* own employer. *Sections 452* [permissive judicial notice] *and 669* [negligence per se] *of the Evidence Code shall apply to this division and to occupational safety and health standards adopted under this division in the same manner as any other statute, ordinance, or regulation. . . .*" (Stats. 1999, ch. 615, § 2, deleted language included as strikethrough text; see also Amendments, Deering's Ann. Labor Code (2006 ed.) foll. § 6304.5, p. 424.)

*Millard* held that a claimed Labor Code safety violation was insufficient to create a triable issue of material fact as to the general contractor's duty of care where there was no evidence the general contractor affirmatively contributed to the plaintiff's injuries. (*Id.* at pp. 1352, 1353.)

We note too that *Elsner* did not discuss or distinguish *Privette, Toland,* or *Hooker.* Further, we find no indication in *Elsner* or in the text of amended Labor Code section 6304.5 that the Legislature intended to bring about a sweeping enlargement of the tort liability of those hiring independent contractors by making them civilly liable for Cal-OSHA or other safety violations resulting in injuries to the contractors' employees.

■  Thus, notwithstanding *Elsner*, safety regulations are only admissible in actions by employees of subcontractors brought against general contractors where other evidence establishes that the general contractor affirmatively contributed to the employee's injuries. (*Millard, supra*, 156 Cal.App.4th at p. 1352; see also, *Evard, supra*, 153 Cal.App.4th at p. 147.) Since we have found no triable issue of material fact with respect to the latter issue, the Cal-OSHA regulations cited by Madden are not sufficient in themselves to create a triable issue of fact on the issue of Summit View's duty of care. As discussed below, we would be constrained to arrive at the same conclusion even if we adopted the analysis in *Evard*, a case that reaches a result at least arguably at odds with *Millard*.

In *Evard*, an employee of an independent contractor hired to work on a billboard sued the billboard's owners for injuries the employee suffered when he fell from the billboard. (*Evard, supra*, 153 Cal.App.4th at p. 141.) A general industry safety order required the owners to provide guardrails or other fall protection measures. (*Id.* at p. 146.) The *Evard* court construed the order as imposing a nondelegable duty on the billboard owners. While purporting to apply the affirmative contribution requirement set out in *Hooker, Evard* reversed a summary judgment in favor of the billboard owners and held that the owners' mere omission to comply with the order was sufficient in itself to create a triable issue of material fact as to whether the owners "breached their nondelegable duty in a manner that affirmatively contributed to Evard's injury." (*Id.* at pp. 147–149; cf. *Ruiz v. Herman Weissker, Inc.* (2005) 130 Cal.App.4th 52, 64 [29 Cal.Rptr.3d 641] (*Ruiz*) [Lab. Code, § 6400 does not establish nondelegable safety duty by independent contractor to employees of subcontractor].)

However, even if we reject *Millard* and *Ruiz* and follow the approach taken in *Evard*, the Cal-OSHA regulation that Madden relies on here—California Code of Regulations, title 8, section 1621—is insufficient to create a triable issue of material fact on the record before us. Section 1621 states in relevant

part: "Unless otherwise protected, [protective] railings . . . shall be provided along all unprotected and open sides, edges and ends of all . . . elevated platforms, surfaces, . . . or other elevations 7 1/2 feet or more above the ground, floor, or level underneath." The evidence shows that the height of the patio from the ground varied from two to eight feet along its 30-to-40-foot length, depending on the slope of the adjacent land. Madden did not know how high he was off the ground when he fell and no one else witnessed the accident. Madden is therefore unable to establish that a safety railing would have been required by section 1621 at the location where he fell. Since he cannot prove a causal relationship between his injuries and Summit View's asserted omission to perform a nondelegable duty, Madden cannot avoid summary judgment even under *Evard*.

For these reasons, we hold that summary judgment was properly granted to Summit View in this case.

## III.  DISPOSITION

The judgment is affirmed.

Stein, Acting P. J., and Swager, J., concurred.