183 Cal.App.4th 219 (2010)
SEABRIGHT INSURANCE COMPANY, Plaintiff and Appellant,
v.
U.S. AIRWAYS, INC., Defendant and Respondent;
ANTHONY VERDON LUJAN, Intervener and Appellant.
No. A123726.
Court of Appeals of California, First District, Division Four.
March 29, 2010.
*222 England Ponticello & St. Clair, Barry W. Ponticello and Nadine D.Y. Adrian for Plaintiff and Appellant.
Hodson & Mullin, Samuel C. Mullin; O'Mara & Padilla and Michael Padilla for Intervener and Appellant.
Dimalanta Clark, Lee W. Clark, Lisa A. Lenoci; Kenney & Markowitz, Stephan E. Kyle and Elizabeth D. Rhodes for Defendant and Respondent.

OPINION
RIVERA, J.
Plaintiff SeaBright Insurance Company (SeaBright) and intervener Anthony Verdon Lujan (Verdon) (collectively appellants) appeal after the trial court granted summary judgment in favor of defendant U.S. Airways, Inc., in this personal injury action. They contend on appeal that the trial court erroneously applied the rule of the Privette-Toland line of cases to conclude that the hirer of Verdon's employer could not be liable for Verdon's injuries. (Privette v. Superior Court (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721] (Privette); Toland v. Sunland Housing Group, Inc. (1998) 18 Cal.4th 253 [74 Cal.Rptr.2d 878, 955 P.2d 504] (Toland).) We agree and reverse.

I. BACKGROUND
SeaBright brought this action for subrogation against the City and County of San Francisco/San Francisco International Airport (the Airport), America West Airlines, Inc.,[1] and others, alleging that it was the workers' compensation carrier for Verdon's employer, the Lloyd W. Aubry Co., Inc. (Aubry), that Verdon was injured when his arm became caught in a conveyor at the Airport, and that defendants breached their duty of care to provide a safe *223 working environment and to provide adequate warnings and safety devices.[2] Verdon intervened, alleging causes of action against U.S. Airways for negligent failure to install safety and warning devices and premises liability.
U.S. Airways moved for summary judgment or summary adjudication against Seabright and Verdon, contending it had a complete defense under Hooker v. Department of Transportation (2002) 27 Cal.4th 198, 200-201 [115 Cal.Rptr.2d 853, 38 P.3d 1081] (Hooker), one of the Privette-Toland progeny. The trial court granted the motions, concluding that appellants had presented no evidence U.S. Airways's affirmative conduct contributed to Verdon's accident, and had not presented admissible evidence concerning the cause of Verdon's injuries.
The undisputed evidence shows that Verdon was employed by Aubry, an independent contractor working under a contract with U.S. Airways to provide "[p]reventive maintenance and repair" services at the Airport.[3] The Airport owned the conveyor belts, and U.S. Airways used them under a space or use permit. Neither U.S. Airways nor its predecessor had manufactured, distributed, or sold conveyor belt systems. Verdon alleged he was injured in the course and scope of his work on a conveyor belt at the Airport on November 3, 2005, when his arm became caught in a moving conveyor that had no shields or cover. At the time, no U.S. Airways employees were working with Aubry employees on the conveyor belt, and none were present at the time of Verdon's injury. Aubry employees received their training from Aubry, not from U.S. Airways employees, and Verdon had received all of his safety training from Aubry or from the millwright union where he learned his trade.
Evidence submitted in support of the motions for summary judgment indicated that U.S. Airways used the conveyor system to deliver bags to and from airplanes, and relied entirely on Aubry for the maintenance and upkeep of the system.[4] Aubry would seek authorization from U.S. Airways before performing repairs that involved shutting the conveyors down. If U.S. *224 Airways became aware of a problem with the conveyor system, it would contact Aubry to make the necessary repairs. It appears that the morning of the incident in question, Verdon attended a safety meeting, and signed a "Daily Safe Plan of Action," which identified hazards in the work he would be doing, including moving parts, low lighting, pinch points, and debris buildup. The "safe plan/control" for these hazards included observing moving parts from a distance, using flashlights, and shutting power off before working on any system.
In a declaration submitted in opposition to the motions for summary judgment, Verdon stated that at the time of the incident, he was performing routine maintenance on the conveyor. The first phase involved observing the conveyor and its moving parts. Although the conveyor would be shut down before performing any actual maintenance or repairs, the initial visual inspection required the conveyor to be running so the inspector could look and listen for certain problems. To do this inspection, Verdon had to work "in a poorly lighted, tight/cramped space close to the conveyor's moving parts," and the conditions limited his available range of body movements and positions. While Verdon was carrying out this inspection, his arm became caught in the moving parts. He averred that he did not reach into the conveyor's moving parts, and that consistent with his training, he had never reached into or knowingly placed his hand or arm into or unreasonably close to the conveyor's exposed moving parts while it was running.[5]
Appellants also submitted a declaration of Matthew T. Wilson, an expert in accident reconstruction as it applies to industrial hazards. Wilson testified that the "head pulley and several tension and take-up pulleys on the subject conveyor were not guarded. This caused the nip points to be fully exposed and a hazard to anyone who worked or passed through the area." He pointed to standards of the American Society of Mechanical Engineers (ASME), which produces and promulgates national standards for conveyor systems, specifying that "`nip and shear points'" should be guarded, as well as California Code of Regulations, title 8, section 4002, which required guarding on certain machines, and section 3999, which required guarding on belt conveyor head pulleys, tail pulleys, single tension pulleys, and dip take-up pulleys.[6] According to Wilson, "[t]he subject conveyor did not have guard(s) covering the nip points located at the bottom of the incline area at the point *225 where Anthony Verdon's arm became entrapped. The lack of such guarding constituted a violation of California Title 8 (Cal OSHA) regulations § 3999 and § 4002," and the lack of proper guarding failed to meet the standard for conveyor safety as promulgated by the ASME. Wilson also stated that he had reviewed the transcript of Verdon's deposition, and opined that had the conveyor been properly guarded as the regulations and standards required, the accident would not have occurred, and if the lighting conditions had met the regulation requirements, the probability of the accident would have been reduced. The trial court sustained U.S. Airways's objections to Wilson's testimony to the extent Wilson opined on the cause of Verdon's injury, but ruled he could properly express an opinion that conditions were unsafe.

II. DISCUSSION

A. Standard of Review

The standard of review after a motion for summary judgment has been granted is well established. "[W]e review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.] Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law. [Citations.]" (Guz v. Bechtel National, Inc. (2000) 24 Cal.4th 317, 334-335 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) In doing so, we "view the evidence in a light favorable to plaintiff [and intervener] as the losing part[ies] [citation], liberally construing [their] evidentiary submission while strictly scrutinizing defendant['s] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's [and intervener's] favor. [Citations.]" (Saelzler v. Advanced Group 400 (2001) 25 Cal.4th 763, 768-769 [107 Cal.Rptr.2d 617, 23 P.3d 1143] (Saelzler).) A moving defendant need not conclusively negate an element of a cause of action; it is sufficient to "`show[] that one or more elements of the cause of action . . . cannot be established' by the plaintiff. (Code Civ. Proc., § 437c, subd. (o)(2).) In other words, all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action . . . ." (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493].) To do so, the defendant may show that the plaintiff does not possess, and cannot reasonably obtain, needed evidence. (Id. at p. 854.)

*226 B. The Privette-Toland Line of Cases

The Privette-Toland cases and their progeny were described thus in Padilla v. Pomona College (2008) 166 Cal.App.4th 661, 668-670 [82 Cal.Rptr.3d 869] (Padilla): "`At common law, a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work.' (Privette, supra, 5 Cal.4th at p. 693.) Privette addressed one exception to the common law rule, the `peculiar risk doctrine,' under which the hirer of an independent contractor to perform inherently dangerous work could be liable for injury to others resulting from the contractor's negligent performance of the work. (5 Cal.4th at p. 691.) Privette held that the peculiar risk doctrine did not apply to employees of the independent contractor injured on the job because they could recover worker's compensation for their injuries. (Id. at p. 701.) . . .
"Subsequently, in Toland[,supra,] 18 Cal.4th [at page] 264 . . ., the court held that Privette applies regardless of whether recovery is sought under the theory that the hirer failed to provide for special precautions in the contract (Rest.2d Torts, § 413), or the hirer is liable for the contractor's negligence in spite of providing in the contract that the contractor take special precautions (Rest.2d Torts, § 416). `In either situation, it would be unfair to impose liability on the hiring person when the liability of the contractor, the one primarily responsible for the worker's on-the-job injuries, is limited to providing workers' compensation coverage.' (Toland . . ., supra, at p. 267.)
(1) "In Hooker, supra, 27 Cal.4th 198, the Supreme Court extended the rationale of Privette to the doctrine of negligent exercise of retained control under the Restatement Second of Torts, section 414. Following the rationale of Privette that it would be unfair to impose liability on the hiring person when the contractor, the one primarily responsible for the worker's on-the-job injuries, is limited to providing workers' compensation coverage, Hooker concluded that `the imposition of tort liability on a hirer should depend on whether the hirer exercised the control that was retained in a manner that affirmatively contributed to the injury of the contractor's employee.' (Hooker, supra, at p. 210.) Thus, although in the case before it the plaintiff had established the defendant hirer retained control over safety conditions at the worksite, the plaintiff had not established that such retained control was exercised in a manner that affirmatively contributed to the plaintiff's injuries. (Id. at p. 215.) Hooker pointed out that a hirer could be liable for omissions as well as affirmative conduct. `There will be times when the hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury.' (Id. at p. 212, fn. 3.)
*227 "As noted in Kinsman [v. Unocal Corp. (2005) 37 Cal.4th 659 [36 Cal.Rptr.3d 495, 123 P.3d 931]], `[a] useful way to view the [Privette] cases is in terms of delegation. . . . [I]n Privette and its progeny, we have concluded that, principally because of the availability of workers' compensation, [the] policy reasons for limiting delegation do not apply to the hirer's ability to delegate to an independent contractor the duty to provide the contractor's employees with a safe working environment.' (Kinsman, supra, 37 Cal.4th at p. 671.)" (Fns. omitted.)
(2) Several cases have considered the continued existence, in light of the above authorities, of liability to the employee of a contractor or subcontractor based on breach of a nondelegable duty. "The nondelegable duty doctrine addresses an affirmative duty imposed by reason of a person or entity's relationship with others. Such a duty cannot be avoided by entrusting it to an independent contractor." (Padilla, supra, 166 Cal.App.4th at p. 671.) The court in Felmlee v. Falcon Cable TV (1995) 36 Cal.App.4th 1032, 1038 [43 Cal.Rptr.2d 158], concluded that "Privette does not purport to abolish all forms of vicarious liability in general, or the doctrine of nondelegable duty in particular, as a basis for suits by employees of contractors against the contractors' employer. . . . [¶] Nondelegable duties may arise when a statute provides specific safeguards or precautions to insure the safety of others."
(3) In some circumstances, a duty imposed on the hirer of an independent contractor by a regulation has been found to be nondelegable, and to survive the Privette line of cases as a basis for liability to the contractor's employee. Appellants rely in particular on Evard v. Southern California Edison (2007) 153 Cal.App.4th 137, 141-142 [62 Cal.Rptr.3d 479] (Evard), which considered the liability of the owners of a billboard to the employee of an independent contractor, who had fallen from the billboard. The issue before the court was whether the billboard owners violated a general industry safety order that required them to provide guardrails or a horizontal safety line, except where the employees were secured to a special purpose ladder. (Id. at p. 146; former § 3416, subd. (a).) The court first concluded that the doctrine of nondelegable duty survived Privette, and that the regulation in question imposed upon the billboard owners a nondelegable duty. (Evard, at pp. 146-147.) It went on to conclude that there was a triable issue of fact as to whether the defendants had breached their nondelegable duty to comply with the regulation, stating, "[t]he liability of a hirer or owner for injury to employees of independent contractors caused by breach of a nondelegable duty imposed by statute or regulation continues to be subject to the test in Hooker. [Citations.] Under that test, `an owner may be liable if its breach of regulatory duties affirmatively contributes to injury of a contractor's employee.' [Citations.] [¶] Liability may be predicated on a property owner's `breach of its own regulatory duties, regardless of whether or not it voluntarily retained control or actively participated in the project. [Citation.] For *228 purposes of imposing liability for affirmatively contributing to a plaintiff's injuries, the affirmative contribution need not be active conduct but may be in the form of an omission to act. [Citation.]' [Citations.]" (Id. at p. 147.) The defendants' omission created "a triable issue of fact as to whether the defendants breached their nondelegable duty in a manner that affirmatively contributed to Evard's injury." (Id. at p. 148.)
(4) Evard relied in part on Barclay v. Jesse M. Lange Distributor, Inc. (2005) 129 Cal.App.4th 281 [28 Cal.Rptr.3d 242] (Barclay). (Evard, supra, 153 Cal.App.4th at pp. 147-148.) The plaintiff there was injured by an explosion while working for his independent contractor employer, while cleaning fuel tanks on land owned by the defendant. The property owner did not direct, control, or supervise the work, and did not contribute any advice or equipment. (Barclay, supra, 129 Cal.App.4th at pp. 285-287.) The plaintiff based his theory of liability on the property owner's alleged affirmative contribution to his injury by its direct negligence in breaching certain nondelegable duties, including a regulation that required suitable portable fire extinguishers to be located within 75 feet of the portion of a petroleum bulk plant facility where fires were likely to occur.[7] (Barclay, at pp. 287-288.) The trial court granted summary judgment to the property owner under the Privette doctrine. (Barclay, at p. 285.) The appellate court reviewed Restatement Second of Torts, section 424, which stated that where specific precautions were required by statute or regulation for the safety of others, the party upon whom the duty was imposed was subject to liability to the others for whose protection the duty was imposed,[8] and concluded that the employees of contractors may be "`others'" for purposes of section 424, subject to the limitation (as in Hooker) that the hirer's conduct must have affirmatively contributed to the employee's injuries. (Barclay, at pp. 290, 295, citing Hooker, supra, 27 Cal.4th 198.) Thus, the property owner could be liable if its breach of regulatory duties owed to the plaintiff affirmatively contributed to his injuries, regardless of whether or not it voluntarily retained control or actively participated in the project. (Barclay, supra, 129 Cal.App.4th at pp. 298, 301.)
The court in Barclay went on to consider whether there was evidence in the record that the property owner affirmatively contributed to the plaintiff's injuries by violating the requirement to provide adequate fire extinguishers, *229 and concluded that there was. In particular, the appellate court pointed to an expert declaration that the property owner was required by both the California Fire Code and industry custom to have fire extinguishers within 75 feet of the tanks, evidence that another worker at the scene had looked for a fire extinguisher in the area but had not seen one, and a doctor's declaration that the plaintiff's injuries would not have been as severe had the flames that injured the plaintiff been extinguished more quickly. (Barclay, supra, 129 Cal.App.4th at pp. 288, 298-299.) The court rejected the argument that the property owner's duty to have adequate fire extinguishers was triggered only by the activity of the contractors. In doing so, it noted that the pertinent fire code provisions applied to the type of facility where the accident had occurred, that accordingly the fire extinguisher requirement was triggered by the fact the defendant owned property where flammable liquids were stored for distribution, and that the duty to supply the fire extinguishers rested on the owner of the plant. (Barclay, at p. 301.)
Barclay relied for its analysis in part on Park v. Burlington Northern Santa Fe Railway Co. (2003) 108 Cal.App.4th 595 [133 Cal.Rptr.2d 757] (Park). (Barclay, supra, 129 Cal.App.4th at pp. 295-298.) The plaintiff in Park, a truck driver for a company that removed hazardous materials under a contract with the defendant railroad, was injured when a plastic drum containing used batteries exploded. The undisputed evidence showed that the railroad's packaging of the batteries posed no danger, and that a disposal company employee's repacking of the batteries was a superseding cause of the injury. (Park, supra, 108 Cal.App.4th at pp. 598-599, 611.) The appellate court reviewed the duties imposed on the generator of hazardous waste by statute and regulation, and concluded they were nondelegable duties that survived Privette, but that the generator was not liable to an employee of a subcontractor who was employed to dispose of the waste unless the generator's conduct affirmatively contributed to the employee's injuries. (Park, at pp. 606-607, 610, citing Hooker, supra, 27 Cal.4th at p. 202.) Because the disposal company's repacking of the batteries was a superseding cause of the injuries, the appellate court concluded the railroad's actions had not affirmatively contributed to the plaintiff's injuries, and accordingly reversed a judgment against the railroad. (Park, supra, 108 Cal.App.4th at pp. 611, 614-615.)
(5) Thus, even after Privette and its progeny, a hirer can be liable to the employee of a contractor if the hirer breaches a nondelegable duty imposed by statute or regulation, and the breach affirmatively contributes to the employee's injury.

*230 C. Application to Appellants' Claims

1. Nondelegable Duty

Appellants contend that U.S. Airways had nondelegable duties found in three state regulations. Section 3999, subdivision (b), applicable to conveyors, provides: "Belt conveyor head pulleys, tail pulleys, single tension pulleys, dip take-up pulleys, chain conveyor head drums or sprockets and dip take-up drums and sprockets shall be guarded. The guard shall be such that a person cannot reach behind it and become caught in the nip point between the belt, chain, drum, pulley or sprocket." Section 4002, subdivision (a) provides: "All machines, parts of machines, or component parts of machines which create hazardous revolving, reciprocating, running, shearing, punching, pressing, squeezing, drawing, cutting, rolling, mixing or similar action, including pinch points and shear points, not guarded by the frame of the machine(s) or by location, shall be guarded." Section 3317, subdivision (a) provides: "Working areas, stairways, aisles, passageways, work benches and machines shall be provided with either natural or artificial illumination which is adequate and suitable to provide a reasonably safe place of employment. . . ."[9]
(6) Nondelegable duties have been found in a variety of situations, and have been held to include the duty "to comply with applicable safety ordinances [citations]; and the duty of employers and suppliers to comply with the safety provisions of the Labor Code [citations]." (Maloney v. Rath (1968) 69 Cal.2d 442, 447 [71 Cal.Rptr. 897, 445 P.2d 513].) In deciding whether duties imposed by statute or regulation are nondelegable, courts have looked to the nature of the regulationthat is, whether it imposes duties on a hirer by virtue of the hirer's role as property owner, or whether the duties it imposes only exist because construction or other work is being performed. For instance, in Padilla, the plaintiff, an employee of a subcontractor, was injured when demolishing unpressurized water pipes during the remodeling of a college dormitory. A portion of a pipe he was demolishing came loose, struck a pressurized pipe and broke it. Water erupted from the pressurized pipe and knocked the plaintiff from his ladder. (Padilla, supra, 166 Cal.App.4th at pp. 664-665.) The plaintiff contended that the general contractor failed to follow California Occupational Safety and Health Act of 1973 (Cal-OSHA; Lab. Code, § 6300 et seq.) regulations requiring utilities to be shut off, capped, or otherwise controlled during demolition, or protected if use was necessary. (Padilla, at p. 666 & fn. 4; § 1735, subd. (a).)
The Court of Appeal concluded the regulation did not impose a nondelegable duty on the defendants, the general contractor, and the college. *231 (Padilla, supra, 166 Cal.App.4th at pp. 671-674.) In doing so, it concluded that Cal-OSHA regulations did not impose a nondelegable duty in every instance; rather, "it is the nature of the regulation itself that determines whether the duties it creates are nondelegable." (Padilla, at pp. 672-673.) To determine whether the regulation in question imposed a nondelegable duty, said the court, "we must look at the language of the regulation itself." (Id. at p. 673.) The court concluded that nothing in the regulation mandated it impose a safety precaution that could not be delegated from the landowner to the general contractor to the subcontractors; the regulation required utility service to be controlled or protected before starting demolition, but "nowhere indicate[d] who must perform these acts and [did] not expressly place the obligation on the landowner." (Ibid.) The court distinguished Evard on the ground that the regulation at issue there "pertained to the condition of the landowner's property, and required the owner to maintain a protective railing on the billboard at all times. This ongoing duty required the guardrails to be in place regardless of whether work was being done on the billboard. The regulation, in other words, imposed a permanent obligation on the owner with respect to the condition of the property; no one but the landowner was in a position to ensure that condition." (Padilla, at p. 673.) In contrast, the regulation at issue in Padilla pertained only to the preparation of the worksite when specific work was being done, that is, when contractors were necessarily present. Therefore, the court concluded, there was no basis to conclude the regulatory duties could not be delegated. (Ibid.)
(7) The obligations imposed by the regulations at issue here are not connected to construction or to work that would naturally be done by independent contractors who would control conditions at a construction site. Rather, they are akin to the requirement in Evard that a billboard owner install guardrails or a safety line, or to the requirement in Barclay that fire extinguishers be present in appropriate locations at a plant. The regulations impose a continuing obligation to provide guards for conveyors and their moving parts and to provide adequate lighting, an obligation that inured to the benefit both of Aubry's employees and of U.S. Airways's own employees when they entered the conveyor area to clear baggage jams. Appellants offered undisputed expert evidence that the conveyor was not properly guarded as required by the applicable regulations.[10] Thus, the regulations impose a nondelegable duty to provide guarding, and this duty survives Privette and its progeny.[11]

*232 2. Affirmative Conduct

Under the authorities we have discussed, U.S. Airways's liability for breach of the duty to provide adequate guarding remains subject to the test of Hookerthat is, U.S. Airways is not liable unless appellants show that by its conduct it affirmatively contributed to Verdon's injury. (Evard, supra, 153 Cal.App.4th at p. 147; Barclay, supra, 129 Cal.App.4th at pp. 298, 301; Park, supra, 108 Cal.App.4th at p. 610.) As stated in Millard v. Biosources, Inc. (2007) 156 Cal.App.4th 1338, 1352 [68 Cal.Rptr.3d 177] (Millard), "safety regulations may be admissible in actions by employees of subcontractors brought against general contractors that retain control of safety conditions, but only where the general contractor affirmatively contributed to the employee's injuries." (Italics added; see also Madden v. Summit View, Inc. (2008) 165 Cal.App.4th 1267, 1280 [81 Cal.Rptr.3d 601] (Madden).)
Here, as we have discussed, there is evidence that U.S. Airways omitted to provide the required safety precautions for the conveyor. Moreover, there is evidence that Aubry was hired to perform routine maintenance and keep the conveyor in working order, not to assess safety features or correct any defects, and that Aubry understood that U.S. Airways was responsible for the conveyor's safety.
U.S. Airways has not shown there is no triable issue as to whether it made such an affirmative contribution, and indeed, under the guiding legal standards, the evidence is susceptible to an inference that U.S. Airways did so. The high court stated in Hooker that an affirmative contribution to the injuries of the contractor's employees need not always be in the form of actively directing the contractor or employee; rather, "[t]here will be times when a hirer will be liable for its omissions." (Hooker, supra, 27 Cal.4th at p. 212, fn. 3.) As the court there explained, "[i]mposing tort liability on a hirer of an independent contractor when the hirer's conduct has affirmatively contributed to the injuries of the contractor's employee is consistent with the rationale of our decisions in Privette, Toland and Camargo [v. Tjaarda Dairy (2001) 25 Cal.4th 1235 [108 Cal.Rptr.2d 617, 25 P.3d 1096]] because the liability of the hirer in such a case is not `"in essence `vicarious' or `derivative' in the sense that it derives from the `act or omission' of the hired contractor."' (Camargo, supra, 25 Cal.4th at p. 1244, quoting Toland, supra, 18 Cal.4th at p. 265.) To the contrary, the liability of the hirer in such a case is direct in a much stronger sense of that term." (Id. at pp. 211-212, fn. omitted.)
Citing Hooker, the court in Barclay concluded that the defendant property owner's breach of its duty to provide fire extinguishers could be the requisite affirmative contribution to the plaintiff's injury. (Barclay, supra, 129 Cal.App.4th at pp. 300-301.) Similarly, in Evard, the appellate court concluded that there was a triable issue of fact as to whether the billboard *233 owners' failure to provide guardrails or a safety line or to ensure the employee was properly secured breached their regulatory duty in a manner that affirmatively contributed to the injuries of the independent contractor's employee. (Evard, supra, 153 Cal.App.4th at p. 148.)
Other cases finding no affirmative contribution are distinguishable from the one before us now. As we have discussed, in Park, the appellate court concluded that the actions of the generator of hazardous waste did not affirmatively contribute to the plaintiff's injuries because the actions of a disposal company in repacking the batteries in question was a superseding cause. (Park, supra, 108 Cal.App.4th at p. 611.) There is no evidence of a superseding cause here.
The court in Millard concluded there was no triable issue as to whether a defendant's actions affirmatively contributed to the injuries of a subcontractor's employee who had fallen through a ceiling after the lights in the area in which he was working went out suddenly, because the defendant did not control the means and methods of the employee's work, and none of the defendant's employees were present at the worksite when the fall occurred. (Millard, supra, 156 Cal.App.4th at pp. 1342, 1348, 1352.) In reaching this conclusion, the appellate court distinguished Elsner v. Uveges (2004) 34 Cal.4th 915, 928 [22 Cal.Rptr.3d 530, 102 P.3d 915] (Elsner), which held that under amended Labor Code section 6304.5,[12] Cal-OSHA provisions were admissible to establish a standard or duty of care in negligence and wrongful death actions. The court in Millard noted that Privette was not at issue in Elsner, "because the plaintiff [in Elsner] was not attempting to impose liability on the general contractor for the negligence of others, but for the general contractor's affirmative contribution to his injuries." (Millard, supra, 156 Cal.App.4th at p. 1350.) Thus, in Elsner, the theory of liability was that the defendant had "`negligently furnished unsafe scaffolding that contributed to [the plaintiff's] injury'" and that it was undisputed that "`when [the defendant] furnished scaffolding for the construction project, he had a common law duty to furnish safe scaffolding.'" (Millard, at p. 1351, italics *234 omitted.) In Millard, on the other hand, there was no such evidence that the general contractor had affirmatively contributed to the employee's injuries. (Id. at p. 1352.)
In Madden, our colleagues in Division One of the First Appellate District followed Millard in considering whether a general contractor was liable to its subcontractor's employee after he fell from a raised unenclosed patio at a home construction site. Cal-OSHA regulations required railing to be provided on all unprotected and open sides of elevated platforms or other elevations of seven and one-half feet or more. The patio was on a slope, such that its elevation ranged from two to eight feet, and the plaintiff did not know how far off the ground he was when he fell. (Madden, supra, 165 Cal.App.4th at p. 1271.) The appellate court agreed with Millard that Privette was not at issue in Elsner because the plaintiff in Elsner "was attempting to impose direct liability on the general contractor for its own affirmative conduct in providing unsafe equipment, not vicarious liability based on its failure to act." (Madden, at p. 1279.) The Madden court concluded that on the facts before it, there was no evidence that the general contractor, its officer, or a project supervisor contributed to the absence of a guardrail by its affirmative conduct; it did not direct that no protection be placed there, the absence of a guardrail was open and obvious, and there was no evidence that the contractor directed the plaintiff to perform his work in a manner that was especially dangerous due to the absence of a railing. (Id. at pp. 1270-1271, 1276-1277.)[13]
In this case, the liability that appellants seek to impose on U.S. Airways is for its own alleged negligence in omitting to guard the conveyor. This liability is in no sense vicarious or derivative of Aubry's, and does not violate the rule of Hooker. On the facts of this case, U.S. Airways has not shown there is no triable issue as to whether it affirmatively contributed to Verdon's injury. The question of whether its omission to provide guarding for the conveyors constituted such an affirmative contribution is properly one for the trier of fact.
We note that the appellate court in Madden expressed doubt about the Evard analysis, which it described as "purporting to apply the affirmative contribution requirement set out in Hooker, [when it] held that the owners' mere omission to comply with the [general industry safety] order was sufficient in itself to create a triable issue of material fact as to whether the owners `breached their nondelegable duty in a manner that affirmatively contributed to Evard's injury.'" (Madden, supra, 165 Cal.App.4th at *235 p. 1280.) This holding, the Madden court stated, was "at least arguably at odds with Millard." (Ibid.)[14] The court in Madden, however, did not consider the effect of Barclay, which concluded there was a triable issue as to whether a property owner affirmatively contributed to the plaintiff's injuries by breaching its regulatory duty to provide adequate fire extinguishers (Barclay, supra, 129 Cal.App.4th at pp. 298-299), or of Park, which indicated that the statutory and regulatory duties of a hazardous waste generator were nondelegable duties that survived Privette (Park, supra, 108 Cal.App.4th at p. 610).
Here, the record contains evidence not simply that U.S. Airways violated safety regulations, but that its violation of those regulations and of applicable industry standards created a hazard to anyone in the area. Moreover, the asserted liability of U.S. Airways here is direct as it is based on a continuing obligation, not one triggered by the presence of contractors. (See §§ 3999, 4002; see also Padilla, supra, 166 Cal.App.4th at p. 673; Barclay, supra, 129 Cal.App.4th at p. 301.)
(8) Our conclusion is in line with the policy behind Privette. In explaining the reason for its decision there, our Supreme Court stated: "[W]hen the contractor's failure to provide safe working conditions results in injury to the contractor's employee, additional recovery from the person who hired the contractora nonnegligent partyadvances no societal interest that is not already served by the workers' compensation system." (Privette, supra, 5 Cal.4th at p. 692, italics added.) This policy is not advanced where, as here, there is evidence from which it could be concluded that the defendant was negligent in a manner that affirmatively contributed to Verdon's injuries.

3. Causation

The trial court sustained U.S. Airways's objections to the declaration of Wilson to the extent Wilson opined on the cause of Verdon's injury, concluding Wilson had no basis to testify about the cause of the injury because there was no evidence of how Verdon's arm became caught in the conveyor. In addition to that opinion, Wilson also opined that the conveyor was not guarded as required by the applicable regulations and standards, and that the *236 lack of guarding created a dangerous condition. The trial court concluded Wilson could properly express an opinion on the safety of the working conditions at issue.
Appellants contend the trial court abused its discretion in sustaining U.S. Airways's objections to Wilson's testimony on the cause of Verdon's accident. We need not decide this issue, because we conclude that even without this testimony there is sufficient evidence to raise a triable issue of fact as to whether the lack of guarding was a cause of Verdon's injury. In considering this question, we are bound by the rule that we must "view the evidence in a light favorable to plaintiff [and intervener] as the losing part[ies] [citation], liberally construing [their] evidentiary submission while strictly scrutinizing defendant['s] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's [and intervener's] favor." (Saelzler, supra, 25 Cal.4th at p. 768.) We may not "draw inferences from thin air" or base them on speculation; rather, any inferences must be drawn from the evidence. (Leslie G. v. Perry & Associates (1996) 43 Cal.App.4th 472, 483 [50 Cal.Rptr.2d 785].) However, "`"[a plaintiff] is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable [persons] may conclude that it is more probable that the event was caused by the defendant than that it was not. . . . If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists."'" (Raven H. v. Gamette (2007) 157 Cal.App.4th 1017, 1029-1030 [68 Cal.Rptr.3d 897].)
Verdon testified that his arm became caught in the moving parts of the conveyor, although he had not reached into or knowingly placed his hand, arm, or other body part into or unreasonably close to the conveyor's moving parts while it was running. Wilson testified that the "nip and shear" points were not guarded, and in particular "did not have guard(s) covering the nip points located at the bottom of the incline area at the point where Anthony Verdon's arm became entrapped," that the nip points were "fully exposed and a hazard to anyone who worked or passed through the area," and that "[t]he lack of required guarding, space limitation restricting Anthony Verdon's available range of body motion and corresponding body positions, along with the sub-standard lighting created a dangerous condition . . . ." Viewing the evidence in the light most favorable to appellants (see Saelzler, supra, 25 *237 Cal.4th at p. 768), we conclude there is a factual question as to whether the unsafe condition of the conveyor, in particular the lack of guarding, was a cause of Verdon's injury.[15]

III. DISPOSITION
The judgment is reversed.
Ruvolo, P.J., and Sepulveda, J., concurred.
NOTES
[1] America West Airlines was a predecessor airline of U.S. Airways. It appears that on the date of the incident at issue here, U.S. Airways and America West Airlines were subsidiaries of U.S. Airways Group, Inc. We shall refer to the airline throughout as U.S. Airways as appropriate. The other defendants have since been dismissed.
[2] We take judicial notice of the complaint in the files of the San Francisco Superior Court. (Evid. Code, § 452, subd. (d).)
[3] The "Services Agreement" in the record between Aubry and America West Airlines, with an effective date of February 12, 1996, specified that Aubry would provide "Preventive Maintenance and repair of conveyor system." A proposal sent by Aubry to the airline in December 1991 indicated that Aubry had included in its quotation "monthly services where we will lubricate and adjust all mechanical components as necessary. All belts will be checked for proper tension and tracking and adjusted as necessary. Drive sprockets and chains will be checked for proper alignment, tension and wear and adjusted as necessary."
[4] Appellants presented evidence, which U.S. Airways did not dispute, that at times U.S. Airways's own employees entered the work space where the conveyor was located to clear baggage jams.
[5] Reports prepared after the incident, and submitted in support of U.S. Airways's motions for summary judgment, indicated that the accident occurred when Verdon reached into the conveyor to remove debris. In opposition to the motions, Seabright submitted declarations made by the authors of those reports, testifying that they did not witness the incident and that before being transported from the scene Verdon neither said he had put his arm into the conveyor nor explained how the incident happened.
[6] These regulations are discussed in more detail below. All undesignated statutory references are to title 8 of the California Code of Regulations.
[7] The regulation in question was the 1998 California Fire Code, section 7904.4.9.2, a portion of the California Building Standards Code then found at title 24, part 9 of the California Code of Regulations. (Barclay, supra, 129 Cal.App.4th at pp. 287-288 & fn. 4.)
[8] Restatement Second of Torts, section 424 provides: "One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions."
[9] These regulations are found among the "General Industry Safety Orders" (§ 3201), which establish standards applicable to all places of employment (§ 3202).
[10] The evidence the lighting did not meet the regulatory standards is less clear. We will rely for our analysis on the alleged lack of guarding.
[11] U.S. Airways does not argue that any such nondelegable duty lies with the Airport, as owner of the conveyors, rather than with U.S. Airways, as the permittee under the space or use permit, arguing instead that the duty was not nondelegable.
[12] Labor Code section 6304.5 provides in part: "It is the intent of the Legislature that the provisions of this division, and the occupational safety and health standards and orders promulgated under this code, are applicable to proceedings against employers for the exclusive purpose of maintaining and enforcing employee safety. [¶] Neither the issuance of, or failure to issue, a citation by the division shall have any application to, nor be considered in, nor be admissible into, evidence in any personal injury or wrongful death action, except as between an employee and his or her own employer. Sections 452 [permissive judicial notice] and 669 [negligence per se] of the Evidence Code shall apply to this division and to occupational safety and health standards adopted under this division in the same manner as any other statute, ordinance, or regulation. . . ."
[13] In the alternative, Madden concluded the plaintiff had not established that the Cal-OSHA regulations had been violated because the plaintiff could not show how far off the ground he was when he fell. (Madden, supra, 165 Cal.App.4th at pp. 1280-1281.)
[14] Madden described Millard as holding that "safety regulations are only admissible in actions by employees of subcontractors brought against general contractors where other evidence establishes that the general contractor affirmatively contributed to the employee's injuries." (Madden, supra, 165 Cal.App.4th at p. 1280, italics added.) Whether Millard was, in fact, referring to evidence "other" than the breach of the regulatory duty itself is not at all clear. (Millard, supra, 156 Cal.App.4th at p. 1352.) Assuming it was, there appear now to be two strands of judicial thought on the interpretation of footnote 3 of Hooker. Barclay and Evard take the view that the breach of a nondelegable statutory or regulatory safety obligation, without more, can create a triable issue as to whether the hirer affirmatively contributed to the employee's injury, while Millard and Madden take the view that it cannot.
[15] Appellants also argue that summary judgment was improper because this case falls within the ambit of McKown v. Wal-Mart Stores, Inc. (2002) 27 Cal.4th 219, 222 [115 Cal.Rptr.2d 868, 38 P.3d 1094], in which our Supreme Court held that "a hirer is liable to an employee of an independent contractor insofar as the hirer's provision of unsafe equipment affirmatively contributes to the employee's injury." (Fn. omitted.) The equipment at issue there was an unsafe forklift provided by Wal-Mart for the contractor's employees to use in installing sound systems. Although resolution of this issue is not necessary to our determination that summary judgment must be reversed, it does not appear to us that the rule of McKown is applicable here, where the contractor's employee was injured not by equipment the hirer provided to use in carrying out the work but by the very equipment the contractor was hired to inspect.