Filed 5/20/15  Sponsler v. Kiewit Infrastructure West CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOE SPONSLER,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>KIEWIT INFRASTRUCTURE WEST CO.,<br><br>    Defendant and Respondent. | G049453<br><br>(Super. Ct. No. 30-2012-00570093)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Luis A. Rodriguez, Judge.  Reversed and remanded.

Stolpman, Krissman, Elber & Silver, Thomas G. Stolpman and Donna Silver for Plaintiff and Appellant.

G&P│Schick and Malcolm D. Schick for Defendant and Respondent.

\*          \*          \*

## INTRODUCTION

Joe Sponsler, an employee of KM Industrial, Inc. (KMI), was injured when he stepped into an 18- to 24-inch depression in the floor of a feed channel in which he had been working. He sued the general contractor on the project, Kiewit Infrastructure West Co. (Kiewit), which had hired KMI, and sought recovery on causes of action for negligence and premises liability. The trial court granted Kiewit's motion for summary judgment, and this appeal followed.

Central to this appeal are *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 (*Hooker*) and *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659 (*Kinsman*). In *Hooker*, *supra*, 27 Cal.4th at pages 202, 213, the California Supreme Court concluded that the hirer of an independent contractor may be held liable for injuries sustained by the contractor's employee if the hirer retained control over safety conditions at a worksite and negligently exercised that control in a manner that "*affirmatively contributed*" to the employee's injuries. In *Kinsman*, *supra*, 37 Cal.4th at pages 664, 673-674, the California Supreme Court concluded that a landowner might be liable for injuries sustained by the contractor's employee from an obvious hazard if the knowledge of the hazard is inadequate to prevent injury and the contractor can take reasonable safety precautions but fails to do so.

As to the cause of action for negligence, we conclude there are triable issues of material fact as to whether Kiewit retained control over safety conditions at the worksite, whether Kiewit negligently retained such control by creating the depression in the floor of the feed channel and by later failing to fix it, and whether any such negligence affirmatively contributed to Sponsler's injuries. As to the cause of action for premises liability, we conclude there are triable issues of fact as to whether out of practical necessity Sponsler might have chosen to encounter the danger presented by the depression and whether KMI could have taken safety precautions but failed to do so. In light of these triable issues, we reverse the judgment and remand for further proceedings.

2

## FACTS

The Orange County Sanitation District (OCSD) hired Kiewit as the general contractor for the construction of a secondary activated sludge facility on OCSD premises. Kiewit hired KMI as a subcontractor to perform painting and sandblasting work at the project. Sponsler was employed by KMI.

The OCSD project included construction of a feed channel or tunnel. The feed channel was about five feet wide, eight feet tall, and 220 feet long. In the floor of the feed channel, about 160 feet from the entrance, was a hole or shaft. Kiewit was responsible for covering such hole openings and had a company policy to cover and secure all open holes and to place a sign warning, "Open Hole; Do Not Remove." Kiewit carpenters placed a plywood cover over the shaft in the floor of the feed channel. The plywood cover rested 18 to 24 inches below the walking surface, creating a depression in the floor of the feed channel.

Workers in the feed channel walking through the area would have to step into the depression and back up onto the concrete. Kiewit did not place a warning sign by the depression. Kiewit's project manager described such a depression as a "booby trap."

Hector Ochoa, KMI's foreman at the OCSD project site, had concerns about pushing wheelbarrows over the depression in the floor of the feed channel. Ochoa showed the depression to Kiewit's general foreman for carpenters, Juan Ortiz, and asked that Kiewit place a new cover over the hole at "grade" (surface) level. Ortiz contacted his supervisor, Jesse Gridley, who told Ortiz, "he didn't have time to stop what he was doing or his men" to place a surface-level cover over the hole in the floor of the feed channel. Only Kiewit had the authority, the supplies, and the carpenters necessary to place a surface-level cover over the depression.

On May 17, 2010, Sponsler and other KMI employees were removing sandblasting debris inside of the feed channel. Sponsler stepped into the depression

3

while he was walking toward the exit of the feed channel with other KMI crew members. He was carrying a broom and a shovel and wearing a full-face respirator, and visibility in the feed channel was impaired by sandblast debris and poor lighting. On stepping into the depression, Sponsler fell into a wall and suffered injuries to his left knee.

KMI was insured for workers' compensation. Sponsler made a claim for workers' compensation benefits and received temporary disability benefits.

## PROCEDURAL HISTORY

Sponsler filed a form complaint asserting one cause of action each for general negligence and premises liability against Kiewit. He alleged Kiewit created a dangerous condition in the feed channel by "covering a vertical shaft with an unsafe, dangerous floor hole covering which was below the level of the walking surface of the tunnel" and, when requested by KMI to place a "proper hole covering over the shaft," Kiewit refused to do so, "thereby forcing [Sponsler] and his coworkers to work in close proximity to the dangerous condition."

Kiewit moved for summary judgment or, in the alternative, for summary adjudication of issues. In support of the motion, Kiewit submitted, among other items of evidence, a declaration from Ochoa. After Kiewit filed the motion for summary judgment, Ochoa was deposed, and Sponsler submitted portions of the transcript of Ochoa's deposition in opposition to the motion. Kiewit, in its reply papers, also submitted portions of the transcript of Ochoa's deposition.

The trial court granted Kiewit's motion for summary judgment and explained its reasons for doing so in a minute order. The trial court found the failure to cover the hole in the feed channel did not affirmatively contribute to Sponsler's injuries. The court stated: "[W]hether [Kiewit]'s initial omission and failure to remedy the improper hole covering after being requested is not in dispute the evidence is overwhelming that [Kiewit] denied the request to fix the insufficient cover and plaintiff

4

returned to the tunnel where the hole [was] with full knowledge of his employer that there was a safety hazard posed by the insufficient cover. . . . The court would find a material fact if contested facts pointed to whether plaintiff had actual or constructive knowledge of the hole and its inadequate cover. But that is not the case here[. I]t is undisputed that plaintiff and his employer specifically knew the condition as they rolled a [wheelbarrow] over it while working. Further, there is no dispute that the plaintiff returned to [the] tunnel looking to fix presumably so the crew could return to its painting and sandblasting work. More importantly the evidence is overwhelming and conclusive that [Sponsler]'s employer knew that the hole presented a safety hazard when his supervisor removed the crew from the tunnel when [Kiewit] foreman Gridley told him that it would not remedy the condition at that time."

After judgment had been entered in Kiewit's favor, Sponsler moved for a new trial pursuant to Code of Civil Procedure section 657 on the grounds of irregularity in proceedings, insufficiency of the evidence, and error in law. Sponsler asserted there were irregularities in proceedings because Kiewit presented, for the first time in its reply papers, evidence and arguments that were crucial to the trial court's determination. Specifically, Sponsler asserted that Kiewit presented passages from the deposition transcript of Ochoa in which he testified Sponsler went back into the feed channel after Ochoa had pulled his work crew from the channel because Kiewit would not place a surface-level cover over the depression in the floor.

The trial court denied Sponsler's motion for a new trial on the ground the alleged irregularity in proceedings did not prevent Sponsler from having a fair hearing and did not materially affect his substantial rights.

## STANDARD OF REVIEW

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.

5

[Citation.]  We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]"  (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)  We liberally construe the evidence in support of the party opposing summary judgment and resolve all doubts about the evidence in that party's favor.  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039.)

## DISCUSSION

## I.

### Workers' Compensation Exclusivity and Workplace Tort Liability:  the *Privette* Line of Authority

In a series of opinions, including *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*), *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 (*Toland*), *Hooker*, *supra*, 27 Cal.4th 198, *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219 (*McKown*), and *Kinsman*, *supra*, 37 Cal.4th 659, the Supreme Court established the circumstances under which an employee (here, Sponsler) of an independent contractor (here, KMI) may sue the hirer or landowner (here, Kiewit) of the independent contractor for workplace injuries.

In *Privette*, *supra*, 5 Cal.4th at page 692, the court held the employee of the independent contractor may not sue the hirer of the contractor under either version of the peculiar risk doctrine set forth in the Restatement Second of Torts.  In *Toland*, *supra*, 18 Cal.4th at pages 257, 270, the court held the employee of the independent contractor may not sue the hirer of the contractor under either version of the peculiar risk doctrine set forth in sections 413 and 416 of the Restatement Second of Torts.  As explained in *Hooker*, *supra*, 27 Cal.4th at page 201:  "Under section 413, a person who hires an independent contractor to do inherently dangerous work, but who fails to provide in the contract or in some other manner that special precautions be taken to avert the peculiar

6

risks of that work, can be liable if the contractor's negligent performance of the work causes injury to others. Under section 416, even if the hirer has provided for special precautions in the contract or otherwise, the hirer can nevertheless be liable if the contractor fails to exercise reasonable care to take such precautions and the contractor's performance of the work causes injury to others."

Key to understanding *Privette* and *Toland* is workers' compensation exclusivity. "When an independent contractor causes injury to the contractor's own employee, the [Workers' Compensation] Act's 'exclusive remedy' provision shields the contractor from further liability for the injury." (*Privette*, *supra*, 5 Cal.4th at p. 698.) It would create an anomaly if the hirer of the independent contractor could be liable in tort under the peculiar risk doctrine for the same "injury-causing conduct" of the independent contractor. (*Ibid.*) The *Privette* court concluded: "When, as here, the injuries resulting from an independent contractor's performance of inherently dangerous work are to an employee of the contractor, and thus subject to workers' compensation coverage, the doctrine of peculiar risk affords no basis for the employee to seek recovery of tort damages from the person who hired the contractor but did not cause the injuries." (*Id.* at p. 702.)

In *Hooker*, *supra*, 27 Cal.4th at page 201, the Supreme Court addressed the issue whether an employee of a contractor may sue the hirer of a contractor for the tort of negligent exercise of retained control set forth in section 414 of the Restatement Second of Torts.[1] The court concluded: "[A] hirer of an independent contractor is not liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but . . . a hirer is liable to an employee of a contractor insofar as

---

[1] Section 414 of the Restatement Second of Torts states: "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

a hirer's exercise of retained control *affirmatively contributed* to the employee's injuries." (*Hooker, supra,* at p. 202.)

In *Hooker,* a crane operator was employed by an independent contractor hired by the California Department of Transportation (Caltrans) to assist in the construction of a freeway overpass. (*Hooker, supra,* 27 Cal.4th at p. 202.) The crane operator habitually retracted the crane's stabilizing outriggers to allow other construction vehicles to pass. (*Ibid.*) When the crane operator tried to swing the boom of the crane without first extending the outriggers, the weight of the boom caused the crane to tip over. The crane operator was thrown to the ground and killed. (*Ibid.*) According to the Caltrans construction manual, Caltrans was responsible for compliance with safety laws and regulations and its construction safety coordinator was supposed to "'*recognize and anticipate unsafe conditions*'" on Caltrans's projects. (*Ibid.*) The senior Caltrans representative on the jobsite, whose responsibilities included safety, had seen the crane operators retract their outriggers to let other vehicles pass and knew a crane would be unstable if its boom were extended over its side while the outriggers were retracted. (*Id.* at pp. 202-203.) The Caltrans engineer on the project had the power to shut the project down because of safety conditions and to remove employees. (*Id.* at p. 203.)

The Supreme Court rejected Caltrans's argument that the contractor's employee should never be allowed any recovery even when the hirer retains control over safety conditions. (*Hooker, supra,* 27 Cal.4th at pp. 206-213.) Instead, imposition of tort liability on the hirer of the contractor depends on whether the hirer exercised the retained control in a manner that "affirmatively contributed" to the injury sustained by the contractor's employee. (*Id.* at pp. 213-214.) "Imposing tort liability on a hirer of an independent contractor when the hirer's conduct has affirmatively contributed to the injuries of the contractor's employee is consistent with the rationale of our decisions in *Privette, Toland* and *Camargo*[ *v. Tjaarda Dairy* (2001) 25 Cal.4th 1235] because the liability of the hirer in such a case is *not* "'in essence 'vicarious' or 'derivative' in the

8

sense that it derives from the 'act or omission' of the hired contractor.""" (*Id.* at pp. 211-212, fn. omitted.)

Affirmative contribution occurs when the hirer "'is actively involved in, or asserts control over, the manner of performance of the contracted work.'" (*Hooker, supra*, 27 Cal.4th at p. 215.) "Such affirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Id.* at p. 212, fn. 3.) When the tort liability of the hirer is based on the hirer's own affirmative conduct, the rule of workers' compensation exclusivity does not preclude the contractor's employee from seeking recovery directly from the hirer. (*Id.* at p. 214.)

The Supreme Court concluded that Caltrans did not affirmatively contribute to the crane operator's death merely by permitting traffic to use the overpass while the crane was being operated. (*Hooker, supra*, 27 Cal.4th at p. 215.) Caltrans did not direct the crane operator to retract his outriggers to permit traffic to pass and "[t]here was, at most, evidence that Caltrans's safety personnel were aware of an unsafe practice and failed to exercise the authority they retained to correct it." (*Ibid.*)

In *McKown, supra*, 27 Cal.4th at page 225, a companion case to *Hooker*, the California Supreme Court held, "when a hirer of an independent contractor, by negligently furnishing unsafe equipment to the contractor, affirmatively contributes to the injury of an employee of the contractor, the hirer should be liable to the employee for the consequences of the hirer's own negligence."

Finally, in *Kinsman, supra*, 37 Cal.4th 659, the Supreme Court addressed the circumstances under which a landowner may be held liable to a subcontractor's employees for hazardous conditions on the landowner's premises. The court concluded, "a landowner that hires an independent contractor may be liable to the contractor's

9

employee if the following conditions are present: the landowner knew, or should have known, of a latent or concealed preexisting hazardous condition on its property, the contractor did not know and could not have reasonably discovered this hazardous condition, and the landowner failed to warn the contractor about this condition." (*Id.* at p. 664, fn. omitted.)

As explained in *Kinsman*, *supra*, 37 Cal.4th at page 671: "A useful way to view the above cases is in terms of delegation. As suggested by *Privette*, at common law it was regarded as the norm that when a hirer delegated a task to an independent contractor, it in effect delegated responsibility for performing that task safely, and assignment of liability to the contractor followed that delegation. (*Privette*, *supra*, 5 Cal.4th at p. 693.) For various policy reasons discussed in *Privette*, courts have severely limited the hirer's ability to delegate responsibility and escape liability. (*Id.* at p. 694.) But in *Privette* and its progeny, we have concluded that, principally because of the availability of workers' compensation, these policy reasons for limiting delegation do not apply to the hirer's ability to delegate to an independent contractor the duty to provide the contractor's employees with a safe working environment. In fact, the policy in favor of delegation of responsibility and assignment of liability is so strong in this context that we have not allowed it to be circumvented on a negligent hiring theory. Nonetheless, when the hirer does not fully delegate the task of providing a safe working environment, but in some manner actively participates in how the job is done, and that participation affirmatively contributes to the employee's injury, the hirer may be liable in tort to the employee."

## II.

### Negligent Exercise of Retained Control

Under *Privette* and *Toland*, Sponsler cannot sue Kiewit under the peculiar risk doctrine, but, under *Hooker*, may sue Kiewit for the tort of negligent exercise of

retained control. As framed by *Hooker*, did Sponsler raise triable issues of material fact as to whether (1) Kiewit retained control over safety conditions at the worksite, (2) Kiewit negligently exercised such retained control, and (3) Kiewit's negligent exercise of retained control "*affirmatively contributed*" to Sponsler's injuries? (*Hooker*, *supra*, 27 Cal.4th at p. 202.)

There is a triable issue of material fact as to whether Kiewit retained control over safety conditions at the feed channel worksite. To be sure, Sponsler reported to Ochoa, who was the KMI supervisor at the worksite, and nobody from Kiewit supervised Sponsler or directed him on performing his job duties. KMI's subcontract required KMI to "take all reasonable safety precautions pertaining to its [w]ork and the conduct thereof" and to comply with the owner's and Kiewit's safety rules.

But the evidence also showed that Kiewit retained exclusive control over the floor of the feed channel and did not delegate that control to KMI. In particular, Kiewit had the responsibility for placing a cover over the depression in the feed channel floor. Ochoa testified that, based on his 24 years of work, he understood the custom and practice to be that the general contractor, not the painting contractor, was responsible for appropriate floor hole coverings. Kiewit's company policy was to cover and secure all open holes in the floor, and to place a sign warning, "Open Hole; Do Not Remove," nearby. KMI's carpenters had placed the plywood cover over the shaft at below ground level, and, viewing the evidence in the light most favorable to Sponsler, only Kiewit had the authority, the supplies, and the carpenters to place a surface-level cover over the depression.

Thus, the evidence established that, in exercising its retained control, Kiewit created the depression in the floor of the feed channel, then declined to place a surface-level cover over the depression when requested to do so by KMI. Under *Hooker*, Kiewit could be liable for its active negligence in creating the depression and for its omission in failing to fix it. (*Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3.) There are triable

11

issues as to whether Kiewit followed its own safety policies in covering the hole and creating the depression.

There are differing versions of the events leading to Sponsler's injuries. Under one version, asserted by Kiewit, Sponsler went back into the feed channel after he and the other members of the KMI work crew had left the channel on Ochoa's orders. Ochoa testified at his deposition that, after having spoken with Ortiz, he removed the work crew from the feed channel out of concern over safety.[2] After leaving the feed channel, Sponsler went into the worksite office and spoke with Ochoa. Sponsler said, "he wanted to see what he could do as far as make—doing something himself to make it work." Sponsler then went back into the feed channel on his own volition and fell into the depression in the floor. When Ochoa was asked whether he should have told Sponsler not to go back into the feed channel, Ochoa replied, "[n]o" because "he's been there so many times that he should have known where the hole was at." Ochoa added, "I didn't think it was a safety issue as far as walking through it."

Under the other version, asserted by Sponsler, he fell into the depression as he was heading out of the feed channel with other members of the KMI work crew. They had been in the feed channel to remove sand debris and, when Sponsler fell into the depression, he was carrying work tools—a shovel and a broom. He testified that he had been sweeping sand in the feed channel just before falling into the depression.

Sponsler's testimony and Ochoa's testimony created a triable issue of material fact. Sponsler did not testify that he returned to the feed channel on his own

---

[2] Ochoa signed a declaration in which he stated that on May 17, 2010, he was aware of the depression but had no safety concerns about KMI employees working near it. Ochoa declared he spoke with Ortiz about putting a different cover over the depression so that a wheelbarrow could be pushed over it. Kiewit told Ochoa it did not have time to cover the depression, and Ochoa "had no expectation that KIEWIT would cover the hole." But, at his deposition, Ochoa testified that he was aware that if a cover had been placed over the depression in the floor of the feed channel, Sponsler's accident would not have happened.

volition after having left it on Ochoa's orders, as Ochoa testified.[3] If, as Sponsler testified, he fell into the depression in the floor of the feed channel as he was walking out with other KMI employees, then the jury must decide whether Kiewit's retained control affirmatively contributed to Sponsler's injuries. As part of its exercise of retained control, Kiewit had its carpenters place the plywood covering over the shaft at 18 to 24 inches below surface level, creating the depression in the floor of the feed channel. The evidence was that Kiewit did not follow its own policy and did not place a sign warning, "Open Hole; Do Not Remove," near the depression. Whether Kiewit was negligent in creating this safety hazard, and whether such negligence proximately caused Sponsler's injuries, are factual issues which the jury must decide.

Kiewit ignores the conflict between Sponsler's testimony and Ochoa's testimony. Instead, Kiewit relies on Ochoa's testimony as establishing without dispute that it was the decision by Sponsler to go back into the feed channel, and Ochoa's failure to stop him, that caused the injuries. Under the relevant standard of review, we liberally construe the evidence in support of Sponsler and resolve all doubts about the evidence in his favor. (*Hughes v. Pair*, *supra*, 46 Cal.4th at p. 1039.) Sponsler's testimony created a triable issue of fact as to causation. Kiewit's failure to address Sponsler's testimony and the triable issue of material fact created by that testimony completely undermine Kiewit's argument it did not, as a matter of law, cause Sponsler's injuries.[4]

---

[3] Sponsler testified Ortiz did not put a ramp over the depression because he received a radio dispatch from Gridley, who told Ortiz there was not time to build a ramp because "he had other things to do, removing lifts."

[4] It was also undisputed that KMI could have pulled its employees from working inside the feed channel if at any point in time it had concern about safety conditions. When Kiewit declined to place a ramp over the depression to allow wheelbarrows to pass over it, Ochoa, KMI's worksite foreman, quickly pulled the KMI work crew from the feed channel. Those are facts the jury should consider in determining whether Kiewit's exercise of retained control affirmatively contributed to Sponsler's injuries.

13

We agree with Sponsler that *Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120 (*Ray*) is analogous and supports reversal. In *Ray*, an employee of an independent contractor was killed when construction materials blew off a bridge in high winds and struck him in the back of the head while he was clearing debris from a roadway. (*Id.* at pp. 1123-1124.) The employee's wife sued the project owner and the general contractor and, in opposing their motion for summary judgment, argued their active negligence caused the employee's death. (*Id.* at p. 1124.) The trial court granted the motion for summary judgment, and a panel of this court reversed. (*Id.* at pp. 1123, 1125.) Based on, and distinguishing *Hooker*, the panel concluded the project owner and the general contractor could have closed the roadway on which the employee was killed by windblown debris, while, in contrast, the independent contractor was contractually barred from doing so. (*Ray*, *supra*, at pp. 1133-1134.) Thus, the project owner and the general contractor retained control over safety conditions at the worksite, and, by failing to barricade the roadway, affirmatively contributed to the employee's death. (*Id.* at pp. 1134, 1138-1139.)

This case presents a stronger argument for imposing liability against the hirer than does *Ray* because Kiewit created the depression into which Sponsler fell. Here, as in *Ray*, the general contractor/hirer retained control over safety conditions at the worksite, and Kiewit could have closed off the feed channel until a surface-level cover had been placed over the depression in the floor. Had Kiewit closed off the feed channel, Sponsler would not have fallen into the depression and suffered injuries. Like the independent contractor in *Ray*, KMI was contractually barred from fixing the safety problem: Only Kiewit could place a surface-level cover over the depression and Kiewit had an express company policy requiring it to do so. Ochoa testified: "I couldn't do anything to fix [the depression] or modify it or—because it's not my—it wasn't my job or—for insurance purposes."

14

Kiewit argues an analogous case is *Madden v. Summit View, Inc.* (2008) 165 Cal.App.4th 1267 (*Madden*). In *Madden*, the plaintiff, an electrician employed by a subcontractor at a home construction site, sustained injuries after falling from a raised unenclosed patio area. (*Id.* at p. 1270.) The plaintiff asserted a cause of action against the general contractor based on the theory his injuries were proximately caused by the general contractor's negligence in failing to place a guardrail along the open side of the patio from which he fell. (*Id.* at pp. 1270, 1276.) About a year before the accident, a subcontractor had built a retaining wall for the patio, but the patio floor remained covered with dirt until the month before the accident. (*Id.* at p. 1271.) Between the time the retaining wall was built and the time the patio floor was cemented over, the patio was used as a walkway and platform for workers at the site, including the plaintiff. (*Ibid.*) There was no railing along the unprotected retaining wall side of the patio, and no railing was built until after the accident. (*Ibid.*) The project supervisor could not install a railing without the general contractor's approval. (*Ibid.*) The trial court granted summary judgment in favor of the general contractor, and the Court of Appeal affirmed. (*Id.* at pp. 1270, 1271.)

The Court of Appeal concluded the plaintiff produced no evidence the general contractor retained control over general safety conditions at the worksite. (*Madden*, *supra*, 165 Cal.App.4th at p. 1276.) Although the general contractor had retained a project supervisor, he did not understand his responsibilities to include jobsite safety. (*Ibid.*) Assuming the general contractor did retain control, the court concluded the general contractor did not contribute to the absence of a guardrail along the open side of the patio for three reasons. (*Ibid.*) First, there was no evidence that the general contractor or its agents directed that no guardrailing or other protection against falls be placed along the raised patio. (*Ibid.*) Second, "the absence of a guardrail was open and obvious to all of the contractors who worked at the site" and "[i]t was undisputed that [the plaintiff] had worked in the area where the fall occurred many times before." (*Id.* at

15

p. 1277.)  Third, there was no evidence that the general contractor or the project supervisor directed the plaintiff "to perform his work in a manner that was especially dangerous due to the absence of a railing."  (*Ibid.*)

Although *Madden* does bear similarities to this case, it is different in two critical respects.  First, there is at least a disputed issue of material fact as to whether Kiewit, the general contractor, retained control over safety conditions in the feed channel.  Second, Kiewit created the unsafe depression in the floor of the feed channel, while in *Madden*, the general contractor was not responsible for the lack of guardrails.  The depression in the floor of the feed channel was known to KMI before Sponsler was injured, and was, like the lack of a guardrail in *Madden*, "open and obvious."  (*Madden*, *supra*, 165 Cal.App.4th at p. 1277.)  But "[t]he obviousness of the hazard does not in and of itself relieve [the hirer] of any duty it might have to eliminate it."  (*Ibid.*, fn. 3.)

## III.

### Premises Liability

Sponsler also sought recovery from Kiewit under a cause of action for premises liability.  In *Kinsman*, *supra*, 37 Cal.4th at page 664, the California Supreme Court addressed whether and under what circumstances a landowner that hires an independent contractor may be liable to that contractor's employee who is injured as a result of hazardous conditions on the landowner's property.  The *Kinsman* court stated the general principles:  "'[I]f a danger is so obvious that a person could reasonably be expected to see it, the condition itself serves as a warning, and the landowner is under no further duty to remedy or warn of the condition.  [Citation.]  However, this is not true in all cases.  "[I]t is foreseeable that even an obvious danger may cause injury, if the practical necessity of encountering the danger, when weighed against the apparent risk involved, is such that under the circumstances, a person might choose to encounter the danger."'  [Citations.]"  (*Id.* at p. 673.)

16

The *Kinsman* court then asked how those general principles applied "when a landowner hires an independent contractor whose employee is injured by a hazardous condition on the premises." (*Kinsman, supra*, 37 Cal.4th at p. 673.) As to obvious hazards, the Supreme Court explained: "[T]he hirer generally delegates to the contractor responsibility for supervising the job, including responsibility for looking after employee safety. When the hirer is also a landowner, part of that delegation includes taking proper precautions to protect against obvious hazards in the workplace. There may be situations, as alluded to immediately above, in which an obvious hazard, for which no warning is necessary, nonetheless gives rise to a duty on a landowner's part to remedy the hazard because knowledge of the hazard is inadequate to prevent injury. But that is not this case, since [Ray] Kinsman acknowledges that reasonable safety precautions against the hazard of asbestos were readily available, such as wearing an inexpensive respirator. Thus, when there is a known safety hazard on a hirer's premises that can be addressed through reasonable safety precautions on the part of the independent contractor, a corollary of *Privette* and its progeny is that the hirer generally delegates the responsibility to take such precautions to the contractor, and is not liable to the contractor's employee if the contractor fails to do so. We see no persuasive reason why this principle should not apply when the safety hazard is caused by a preexisting condition on the property, rather than by the method by which the work is conducted." (*Id.* at pp. 673-674.)[5]

---

[5] As to concealed hazards, the Supreme Court explained: "[I]f the hazard is concealed from the contractor, but known to the landowner, the rule must be different. A landowner cannot effectively delegate to the contractor responsibility for the safety of its employees if it fails to disclose critical information needed to fulfill that responsibility, and therefore the landowner would be liable to the contractor's employee if the employee's injury is attributable to an undisclosed hazard. Nothing in the *Privette* line of cases suggests the contrary." (*Kinsman, supra*, 37 Cal.4th at p. 674.)

17

Here, we will assume for purpose of analysis that the depression in the floor of the feed channel was obvious.[6] Sponsler testified that before the incident on May 17, he had been inside the feed channel on three or four occasions, knew about the depression, and had spoken with an Orange County inspector about it.

Kiewit delegated to KMI responsibility for looking after employee safety but retained exclusive control over the floor of the feed channel. Thus, Kiewit did not delegate the responsibility to remedy safety hazards such as the depression in the floor of the feed channel. Based on a theory of premises liability, Kiewit might be liable for injuries caused by the depression in the floor of the feed channel, even though the depression was an obvious danger, if Sponsler and the other KMI crew members had chosen to encounter the apparent risk out of practical necessity. That situation might have arisen if, for example, the KMI work crew had no practical choice but to work around (encounter) the depression in the floor of the feed channel to perform their assigned tasks. We conclude there is a triable issue whether the "'"'practical necessity of encountering the [depression], when weighed against the apparent risk involved, is such that under the circumstances, [Sponsler] might choose to encounter the danger.'"'" (*Kinsman*, *supra*, 37 Cal.4th at p. 673.)

Kiewit would not be liable to Sponsler for premises liability if KMI could have taken safety precautions but failed to do so. This also is a triable issue of material fact. KMI had neither the authority nor the ability to place a surface-level cover over the depression in the floor of the feed channel. Only Kiewit could remedy the hazard created by the depression.

---

[6] There appears to be no dispute that Kiewit was a landowner for purposes of premises liability. The term "landowner" for purposes of premises liability refers to "an owner or a possessor of land that owes some kind of duty of care to keep the premises safe." (*Kinsman*, *supra*, 37 Cal.4th at p. 664, fn. 1.) The latter category includes one who has supervisory control over activities conducted upon, and the condition of, the land. (*Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1157-1158.)

18

## IV.

## Motion for a New Trial

Sponsler argues the trial court erred by denying his motion for a new trial because Kiewit submitted new evidence in its reply in support of its summary judgment motion, and the new evidence caused Sponsler to suffer "extreme prejudice." Because we are reversing the judgment as to the negligence cause of action, we need not resolve whether the trial court erred by denying Sponsler's motion for a new trial.

## DISPOSITION

The judgment is reversed and the matter remanded for further proceedings. Appellant shall recover costs incurred on appeal.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.


19