Filed 11/21/23  Martinez v. CalCom Roofing CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ROSA MARIA REYES MARTINEZ et al., | D082216 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. RIC1904392) |
| CALCOM ROOFING, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from judgments of the Superior Court of Riverside County, Daniel A. Ottolia and Craig Riemer, Judges.  Affirmed.

Steven B. Stevens, A Prof. Corp., and Steven B. Stevens; Jacoby & Meyers Attorneys and Laura F. Sedrish, for Plaintiffs and Appellants.

Law Office of Jillisa L. O'Brien, Inc., Jillisa L. O'Brien, Conor H. McElroy, for Defendant and Respondent CalCom Roofing, Inc.

Horvitz & Levy, Curt Cutting, Bradley S. Pauley; Law Offices of Beth M. Henderson and Robert E. Henke, for Defendants and Respondents Bryan Industrial Properties, Inc., Hoyt Gregory S RSH FT TR B SETT TR, and RS Hoyt Jr. Family Trust.

Defendants Bryan Industrial Properties, Inc., Hoyt Gregory S RSH FT TR B SETT TR, and RS Hoyt Jr. Family Trust (Bryan Industrial/Hoyt) hired CalCom Roofing, Inc. to reroof their commercial warehouse building. Bryan Industrial/Hoyt defined the project to include removing the roof's two layers of cap sheet from the existing plywood roof deck and then installing new roof board over the plywood.

CalCom hired Honeycutt Construction Management, LLC to tear off the existing cap sheet and Elite Roofing Supply to supply and deliver the roofing materials and load them onto the roof. On the day that Honeycutt began tearing off the cap sheet, Elite Roofing began loading materials onto an area of the roof that it and Honeycutt selected. While Elite Roofing employee, Willfred Reyes, was carrying sheets of roof board on the roof, a portion of the roof that Honeycutt had stripped of cap sheet gave way underneath him. Reyes fell through the roof to his death.

Reyes' parents, Rosa Maria Reyes Martinez and Rodrigo Delgado Fernandez (the Parents), recovered workers' compensation benefits from Elite Roofing for Reyes' death. They then filed a wrongful death negligence and premises liability action against Bryan Industrial/Hoyt, CalCom, and Honeycutt.

Under *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*), an independent contractor's employee is generally barred from recovering damages from the contractor's hirer for an on-the-job injury. (*SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 594 (*SeaBright*).) Two exceptions exist: (1) where the injury results from a concealed hazardous condition on the property that the landowner-hirer knew or should have known of, that the contractor did not know of and could not reasonably ascertain, and about which the landowner-hirer failed to warn the contractor

2

(*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 664 (*Kinsman*)), and (2) where the hirer retained control over any part of the work and exercised that control in a way that affirmatively contributed to the worker's injury (*Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 202 (*Hooker*)).

Bryan Industrial/Hoyt and CalCom separately moved for summary judgment on the grounds that *Privette* applied and barred the claims against them. The Parents opposed both motions, contending that the *Kinsman* and *Hooker* exceptions applied. The trial court disagreed and granted the motions, finding the *Privette* doctrine applied and the Parents had not shown a triable issue of fact as to either exception's application.

On appeal, the Parents argue—for the first time—that the *Privette* doctrine cannot apply to Elite Roofing because it was a mere "material supplier" and not a contractor. The Parents further argue in the alternative that, even assuming Elite Roofing was a contractor to which *Privette* applied, a triable issue of fact exists as to either or both exceptions. First, they contend there is substantial evidence that Bryan Industrial/Hoyt and CalCom knew or should have known about the roof's allegedly hazardous condition because the plywood underneath the roof's cap sheet had been weakened by age and water damage. Second, they contend there is substantial evidence that Bryan Industrial/Hoyt and CalCom retained control over the reroof project and exercised that control in a manner that affirmatively contributed to Reyes' fall, including by requiring that the cap sheet be removed and by failing to provide a fall protection system on the roof. We disagree with each of these contentions and affirm the judgments in favor of Bryan Industrial/Hoyt and CalCom.

3

## I.

## A.

In 1967, Bryan Industrial built a commercial warehouse in Anaheim, California for Hoyt. When constructing the roof, Bryan Industrial used the thinnest plywood panels—three-eighths of an inch—acceptable for the roof deck at the time. As of 2019, the warehouse's roof was still comprised of the original three-eighths inch plywood, which was covered with the original layer of cap sheet and a second layer from a past reroof.

Bryan Industrial also managed the warehouse property for Hoyt. In 2001, Bryan Industrial hired property manager Kevin Zeigler, who had decades of experience in roofing, inspecting roof systems, conducting leak investigations, and providing general consulting for roof system installations. Bryan Industrial also hired CalCom to perform annual maintenance on the warehouse roof, much of which was preventative. According to CalCom, this maintenance included applying new roof mastic over the top of any areas on the cap sheet roofing system where existing roof mastic showed signs of cracking or where a nail head might have popped through the cap sheet. Then CalCom applied a white reflective paint over the new roof mastic to proof it from the sun and water.

Over the years, CalCom also repaired water leaks in the warehouse's roof. In April 2013, CalCom repaired a water leak in the roof's northwest corner. It patched a leak in the roof's southwest corner where water from the roof went into a downspout and was leaking into an office. CalCom additionally repaired leaks around May 2015 and December 2018. During this time, no one informed CalCom of any concerns about the roof plywood's safety or condition.

B.

At some point, Hoyt and Bryan Industrial decided to replace the warehouse roof during the approximately one-month period that the warehouse would be vacant between tenants. Zeigler testified that they decided to replace the roof because they had been experiencing a few roof leaks over the years, and although the roof had some more "life left to it," it was extremely difficult to install a new roof when the warehouse was occupied by a tenant.

In May 2019, Bryan Industrial hired CalCom to reroof the warehouse. Bryan Industrial also hired an air conditioning contractor, AccuTemp, to remove some of the rooftop's air conditioning ducts and exhaust fans that were no longer in use. In addition, Zeigler tasked Bryan Industrial's maintenance supervisor, Octavio Salcedo, with preparing the warehouse for the reroof project. That work included locating and removing roof penetrations—pipes through the roof—that were no longer in use, marking from inside the warehouse where skylights would be installed, and cutting out the insulation where the skylights would be placed.

On May 31, 2019, Bill Leinenweaver of CalCom, Zeigler and Salcedo of Bryan Industrial, and Kirk Vasquez of AccuTemp performed a jobsite walkthrough for the reroofing project, which included assessing the overall condition of the warehouse and rooftop. At the time of the walkthrough, the warehouse's existing cap sheet roofing system was still in place. During the walkthrough, Zeigler, Salcedo, Leinenweaver, and Vasquez walked "all over the roof," and Zeigler did not locate any weak or compromised areas. Likewise, Leinenweaver of CalCom did not discover or observe anything that concerned him about the roof's condition.

5

Bryan Industrial and Hoyt defined the reroof project for CalCom to include removing the two layers of cap sheet roof and then installing DensDeck roof board over the existing plywood substrate, which was underneath the cap sheet. CalCom's responsibilities included adding the new DensDeck roofing material; determining which contractors to hire to perform the tear off of the existing roof and to provide the necessary roofing supplies; and managing the sequencing of the contractors it hired for the job.

To that end, CalCom hired Honeycutt to tear off the existing cap sheet roofing. CalCom also purchased roofing supplies from Elite Roofing and hired Elite Roofing to deliver and load the supplies onto the rooftop. CalCom did not offer or promise Honeycutt or Elite Roofing that it would provide any type of safety measures related to their work.

C.

On June 7, 2019, Elite Roofing began delivering the materials to the jobsite for CalCom. Before loading materials onto any roof at a jobsite, Elite Roofing's normal procedure was to inspect the roof, including inspecting inside the building to ensure the beams were "okay" and then checking while on the actual roof to ensure the roof was strong. If the Elite Roofing employees felt the roof was unsafe or weak, they could use fall restraint harnesses kept in Elite Roofing's truck.

Before going onto the roof on June 7, 2019, Elite Roofing employees determined that the roof appeared to be safe by inspecting the roof from inside the warehouse and using a ladder to visually inspect the roof from the outside. Jose Hernandez, an Elite Roofing employee, testified that he and two other Elite Roofing employees conducted a visual inspection of the warehouse's interior to ensure the beams were "solid" before going onto the roof. Elite Roofing employees testified that they decided fall restraint devices

6

were unnecessary for their work on the warehouse roof because the roof was flat and "they were not going to get near the edge."[1]

When Elite Roofing started loading the roof with supplies, Honeycutt was already on the roof tearing off the cap sheet. Elite Roofing employees used a forklift—which they brought to the property—to load the materials onto the roof. Elite Roofing employees decided to stack the materials on the roof in a location that they and a Honeycutt employee determined would be safest and out of Honeycutt's way. CalCom did not direct Elite Roofing or its employees on how to deliver the materials or where to load them on the roof. At no time during Elite Roofing's work did Elite Roofing observe anything on the roof deck that appeared unsafe.

While two Elite Roofing employees—Willfred Reyes and a coworker—together carried some sheets of roof board near the center of the warehouse's roof, the plywood underneath Reyes gave way, and he fell through the roof to his death.

The location where Reyes fell was not an area where there had been any previously repaired water leaks and was not near any penetrations removed by AccuTemp or Salcedo. Earlier that day, Salcedo of Bryan Industrial had walked in the general area where Reyes later fell, including on the plywood deck after the cap sheet had been removed, and he did not see a hole or notice anything out of the ordinary. CalCom had not been to the

---

[1]     It is also undisputed that the warehouse roof did not have any anchor points or harness systems installed for use with fall restraint devices. However, the parties do not identify any evidence suggesting that Elite Roofing employees noticed the lack of anchor points or harness systems on the roof or that this influenced their decision not to wear their fall restraint harnesses.

jobsite at any point between the time Honeycutt began tearing off the cap sheet and Reyes' fall.

At some point after Reyes' fall, Zeigler arrived to the jobsite. He later used a drone to take photographs of the roof, which showed that Reyes fell through a portion of the roof where Honeycutt had already removed the two layers of cap sheet.

Following the accident, CalCom hired an engineer to design a fall protection system, and installed tie-off anchors and walkways for workers to use on the roof. In August 2019, Honeycutt and CalCom crews walked the entire roof deck during the tear off and reroof process without the plywood roof deck breaking or giving way in any other area.

## D.

After Reyes' death, the Parents received workers' compensation benefits from Elite Roofing's insurer. They additionally filed a wrongful death action against CalCom, Honeycutt, Bryan Industrial, and Hoyt for general negligence and against Bryan Industrial and Hoyt for premises liability.

Bryan Industrial/Hoyt and CalCom separately moved for summary judgment, contending that the Parents' claims were barred by *Privette*, which held that the hirer of an independent contractor generally is not liable for on-the-job injuries sustained by the independent contractor's employees. The Parents opposed both motions, arguing exceptions to *Privette*'s nonliability rule applied, including that (1) defendants retained control over the jobsite and affirmatively contributed to Reyes' death and (2) defendants failed to warn Elite Roofing about the roof's concealed hazardous condition.

In support of their oppositions to both motions for summary judgment, the Parents filed the declaration of their civil engineer expert, Brad P. Avrit.

8

Avrit opined that three-eighths inch plywood has decreased weightbearing capacity and is more susceptible to structural compromise due to age, exposure to the elements, and other factors compared to thicker five-eighths inch or half inch plywood. He averred that because the warehouse building's original three-eighths inch plywood panels "were essentially over 50 years old," they were "subject to aging and deterioration factors that would typically compromise such an old structural component." He opined that he inspected the plywood panel that collapsed under Reyes and found that "either due to the old age of the plywood and/or inherent conditions, the subject plywood panel was delaminated, dried out, and/or otherwise defective, which is visible and/or identified in [his] inspection photographs." He further averred that Honeycutt's scraping and removal of layers of cap sheet further eroded the plywood panel's structural integrity and stability.

Avrit concluded that CalCom, Bryan Industrial, and Hoyt knew "there was a high likelihood of rotted and/or degraded wood panels on the roof." As support for this opinion, he noted the roof's 50-year-old age and observed that CalCom's June 3, 2019 contract included line items for replacement of "rotted plywood," and that the property had experienced previous water leaks in the southwest and northwest corners repaired by CalCom.[2]

Avrit further concluded that CalCom, Bryan Industrial, and Hoyt knew or should have known of the roof's "defective condition" and the dangerous roofing operation at the time of Reyes' accident. As to CalCom, Avrit observed that CalCom had knowledge of prior leaks and repairs over the

---

[2]     As additional support for his opinion, Avrit stated that Zeigler had testified the plywood was either installed damaged or was damaged by water intrusion. However, as the parties acknowledged in letters they submitted after oral argument, this purported deposition testimony is not in the record before us. Therefore, we need not and cannot consider it.

9

previous decade, and as to all three defendants, they had the "knowledge, experience and roofing expertise to best assess the roof conditions."

Bryan Industrial/Hoyt and CalCom objected to Avrit's declarations filed in opposition to their respective motions. The court overruled all objections to Avrit's declarations and granted Bryan Industrial/Hoyt's and CalCom's motions for summary judgment. In both of its orders on the motions for summary judgment, the trial court found *Privette* barred liability and that no exceptions to *Privette* applied. The court then entered judgments in favor of Bryan Industrial/Hoyt and CalCom, and the Parents appealed.

## II.

### A.

Under California's *Privette* doctrine, an employee of an independent contractor is generally barred from recovering damages from the hirer of that contractor for an on-the-job injury. (*SeaBright*, *supra*, 52 Cal.4th at p. 594.) The doctrine is based on the rationale that California's "workers' compensation scheme 'is the exclusive remedy against an employer for injury or death of an employee.' " (*Privette, supra*, 5 Cal.4th at p. 697.) It follows that " 'an independent contractor's employee should not be allowed to recover damages from the contractor's hirer, who is "indirectly paying for the cost of [workers' compensation] coverage, which the [hired] contractor presumably has calculated into the contract price." ' " (*Alvarez v. Seaside Transportation Services LLC* (2017) 13 Cal.App.5th 635, 640 (*Alvarez*).) In other words, an independent contractor's employee injured on the job is generally entitled to no greater damages than a similarly situated employee of the hirer—both are limited to workers' compensation benefits.

Over time, our Supreme Court has "recast [the] primary rationale for the *Privette* doctrine in terms of delegation rather than workers'

10

compensation." (*Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 270 (*Sandoval*).)  Because contractors typically are expected to perform the contracted work more safely than hirers, the Supreme Court has "endorsed a 'strong policy' of presuming that a hirer delegates all control over the contracted work, and with it all concomitant tort duties, by entrusting work to a contractor." (*Ibid*.)  As a result, "[t]here is a strong presumption under California law that a hirer of an independent contractor delegates to the contractor all responsibility for workplace safety." (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 37 (*Gonzalez*).)

There are two narrow exceptions to the *Privette* doctrine, which "apply where delegation is either ineffective or incomplete." (*Sandoval, supra*, 12 Cal.5th at p. 271.)  One such exception—known as the concealed hazard exception—applies when "a hirer intends to delegate its responsibilities to the contractor in principle but, by withholding critical safety information, fails to effectively delegate its responsibilities in practice." (*Ibid*.)  The other—known as the retained control exception—similarly applies where the delegation is incomplete.  That exception is triggered when "the hirer retains control over any part of the work and actually exercises that control so as to affirmatively contribute to the worker's injury." (*Ibid*.)

B.

On appeal from a judgment entered after an order granting summary judgment, we review the record de novo to determine whether triable issues of material fact exist and whether the moving party is entitled to judgment as a matter of law.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).)  Because the *Privette* doctrine affects the burden of producing evidence, once the defendant hirer establishes the foundational facts for the *Privette* doctrine to apply—that the defendant hired the plaintiff's employer

11

to perform work on the jobsite and the plaintiff was injured while working at the site—the burden shifts to the plaintiff to raise a triable issue of material fact. (*Alvarez, supra,* 13 Cal.App.5th at pp. 643–644.) Thus, the plaintiff can rebut *Privette*'s presumption of delegation only by presenting admissible evidence making a prima facie showing of a triable issue of fact in support of one or more exceptions to *Privette*. (*Id.* at pp. 644–646.) However, if the defendant "provided sufficient evidence to trigger the *Privette* presumption and [the] plaintiff d[oes] not raise a triable issue of fact," the defendant is entitled to summary judgment. (*Id.* at p. 646.)

## III.

### A.

In their motions for summary judgment, CalCom and Bryan Industrial/Hoyt both established with undisputed evidence that Bryan Industrial/Hoyt hired CalCom for the reroofing project; CalCom hired Reyes' employer, Elite Roofing, to supply, deliver, and load roofing materials onto the roof; and Reyes fell while performing that delivery and loading work for his employer, Elite Roofing. That was enough to establish the *Privette* doctrine applied and to "shift[ ] the burden to [the Parents] to raise a triable issue of fact" as to the applicability of an exception to *Privette*. (*Alvarez, supra*, 13 Cal.App.5th at p. 644.)

Yet, for the first time on appeal, the Parents argue the *Privette* doctrine does *not* apply. In an argument they did not raise either in briefing or during the summary judgment hearings before the trial court, the Parents now assert that Elite Roofing was merely a "vendor" or "materials supplier" and not a "contractor"—which they define, without authority, as someone who "actually d[id] work on the land, building, or project." The Parents' theory goes that *Privette* applies only to "contractors," and because Elite Roofing

12

simply delivered and supplied roofing materials without performing any "work" on the warehouse roof, *Privette* cannot apply.

We need not consider the Parents' new argument because it was not raised before the trial court and thus, is forfeited. "[P]ossible theories that were not fully developed or factually presented to the trial court cannot create a 'triable issue' on appeal." (*American Continental Ins. Co. v. C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1281; cf. *Ryan v. Real Estate of the Pacific, Inc.* (2019) 32 Cal.App.5th 637, 644 [considering plaintiffs' new theory on appeal regarding an issue that plaintiffs had previously challenged in the trial court because it presented a pure question of law to be applied to undisputed facts].) "A party is not permitted to change his [or her] position and adopt a new and different theory on appeal. To permit him [or her] to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst v. Searle* (1933) 218 Cal. 233, 240–241.)

Having determined that CalCom and Bryan Industrial/Hoyt carried their burden of establishing the *Privette* presumption applies to bar liability, we next consider whether the Parents have produced admissible evidence raising a triable issue of fact as to either exception's application.

B.

In a premises liability action, the "usual rules about landowner liability" are "modified, after *Privette*, as they apply to a hirer's duty to the employees of independent contractors." (*Kinsman, supra,* 37 Cal.4th at p. 674.) Because the landowner delegates responsibility for employee safety to the independent contractor, "a hirer has no duty to act to protect the employee when the contractor fails in that task and therefore has no liability." (*Ibid.*) Under the concealed hazard exception, however, "the hirer as landowner may be independently liable to the contractor's employee . . . if

13

(1) [the landowner] knows or reasonably should know of a concealed, pre-existing hazardous condition on [the] premises; (2) the contractor does not know and could not reasonably ascertain the condition; and (3) the landowner fails to warn the contractor." (*Id.* at p. 675.) The Parents contend a triable issue of fact exists as to whether this exception applies to their claims against Bryan Industrial/Hoyt and CalCom. We disagree.

1.

As to their premises liability claim against Bryan Industrial/Hoyt, the Parents argue a reasonable jury could find each element of the exception: (1) Bryan Industrial/Hoyt knew, or should have known, of a concealed preexisting hazardous condition on the roof; (2) Elite Roofing did not know and could not reasonably have discovered the hazardous condition; and (3) Bryan Industrial/Hoyt failed to warn Elite Roofing about the hazardous condition. (*Kinsman, supra*, 37 Cal.4th at p. 675.) Pointing to their expert's declaration, the Parents contend a preexisting concealed hazard existed because the plywood roof deck had not been replaced in 50 years, it was built using the thinnest plywood permitted at the time of its construction so that its "weight bearing potential declines" compared to thicker plywood, and the plywood was more susceptible to structural compromise because of its age and weather exposure.

Even accepting that the roof plywood was weak and constituted a "concealed hazardous condition," however, the Parents fail to identify substantial evidence that Bryan Industrial/Hoyt *knew* or *should have known* of it. The Parents contend Bryan Industrial/Hoyt clearly knew of the plywood's condition because they included a line item in their reroofing contract with CalCom requiring CalCom to "replace rotted plywood as necessary." We do not agree that this single line item, without more, creates

14

a triable issue of fact. The contract also required CalCom to install the DensDeck roof board *over* the existing plywood, rather than removing and replacing the plywood first. Thus, we cannot reasonably infer that Bryan Industrial/Hoyt, knowing the roof's plywood was in such a hazardous and rotten condition, would pay a company to install roof board over that plywood without replacing it first. It is also undisputed that CalCom was not informed the plywood was in poor condition or that there were any concerns about its safety. Accordingly, we cannot conclude this single contract term is evidence from which a jury could reasonably infer that Bryan Industrial/Hoyt actually knew the plywood was hazardous. (See *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651 (*Roddenberry*) ["Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence."]; *LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981 [A party "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact."].)

Likewise, there is no evidence from which a reasonable jury could find that Bryan Industrial/Hoyt reasonably *should have known* of the plywood's concealed hazardous condition. Before Reyes' fall, there were several visual inspections of the roof, all of which indicated that the roof's condition appeared safe. One of those inspections took place during a May 31, 2019 walkthrough, before Honeycutt began tearing off the roof's cap sheet. During that pre-job walkthrough, representatives from CalCom, Bryan Industrial, and AccuTemp walked "all over the roof," and both Bryan Industrial's and

15

CalCom's representatives testified they did not discover or observe anything concerning about the roof's condition.

A second inspection took place about a week later, on the morning of Reyes' fall. The undisputed evidence shows that before loading materials onto the roof, Elite Roofing employees visually inspected the roof from both the inside and outside of the warehouse and determined that the roof appeared safe. Elite Roofing employees also testified that they never observed anything on the roof deck—even where the cap sheet had been removed by Honeycutt—that appeared unsafe. Finally, the undisputed evidence also shows that Salcedo of Bryan Industrial walked on the plywood deck after the cap sheet's removal in the general area where Reyes later fell and did not observe a hole or notice anything out of the ordinary.

The Parents attempt to challenge some of this evidence by characterizing Elite Roofing as an unsophisticated delivery company that lacked sufficient roofing knowledge or expertise to evaluate a roof's safety. The undisputed evidence, however, shows that Elite Roofing regularly loaded materials onto roofs using specialized equipment like forklifts and that its normal procedure before doing so included inspecting the roof at a jobsite, both from the interior and exterior of the building. Elite Roofing employees also testified to having received training from Elite Roofing about inspecting roofs and safety.

The Parents further contend the inspection-related evidence "establishes nothing conclusively." But that is not Bryan Industrial/Hoyt's burden. Rather, it is the *Parents'* burden to proffer admissible evidence showing a triable issue of fact as to whether Bryan Industrial/Hoyt knew or should have known of the plywood's hazardous condition. Although we construe all reasonable inferences in the Parents' favor, we cannot reasonably

16

infer from this evidence that, as the Parents contend, the inspections were somehow "unreasonable." (*Annod Corp. v. Hamilton & Samuels* (2002) 100 Cal.App.4th 1286, 1298–1299.)

The Parents additionally complain that this inspection evidence does not conclusively establish "there were no weaknesses in the roof." As discussed above, we assume for purposes of our analysis that the plywood roof *was* weak and posed a hazardous condition.

The Parents next emphasize Zeigler's significant roofing experience and expertise. In their separate statement, the Parents relied on their expert's opinion that someone with Zeigler's experience should have known "there was a high likelihood of rotted and/or degraded wood panels on the roof" because of the age of the roof and previously repaired water leaks. But expert opinion that someone should have known of a "high likelihood" of a hazardous condition existing is not evidence from which a jury could reasonably find that person knew or reasonably should have known of an *existing* concealed hazardous condition. (See also *Roddenberry*, *supra*, 44 Cal.App.4th at p. 651 ["Opinion testimony which is conjectural or speculative 'cannot rise to the dignity of substantial evidence.' "].) Moreover, the expert's opinion that, simply by virtue of his credentials, Zeigler knew or should have known of the plywood's hazardous condition is not substantial evidence raising a triable issue of fact, particularly where (1) the undisputed evidence shows that the plywood's condition was not visible when covered by the cap sheet at the time Zeigler inspected the roof and (2) Zeigler expressly testified that he was unaware of the plywood's hazardous condition.

Throughout their briefing on appeal, the Parents additionally insinuate that Bryan Industrial/Hoyt should have known of the plywood's condition because water leaks and/or the three-eighths inch thickness of the plywood

17

may have contributed to its unsafe state. Those arguments, too, are unpersuasive. First, the Parents offer no evidence that any of the previously repaired water leaks occurred in the vicinity of Reyes' fall. Meanwhile, Bryan Industrial/Hoyt produced undisputed evidence that *no* leaks had been previously observed in the roof's central area where Reyes fell. Second, it is undisputed that the plywood's three-eighths inch thickness was code-compliant at the time the roof was built, and the Parents identify no evidence indicating, for example, that other parts of the plywood roof had to be replaced with thicker plywood during the reroofing project. In other words, the Parents' expert's opinion that thinner three-eighths inch plywood is generally more likely to weaken over time than thicker plywood does not create a triable issue that Bryan Industrial/Hoyt reasonably should have known *this* roof's three-eighths inch plywood was, in fact, dangerously weak and unsafe.

Moreover, the Parents do not identify any admissible evidence supporting the second element of this *Privette* exception—that *Elite Roofing* could not reasonably have discovered the plywood roof deck's hazardous condition. Because Elite Roofing was hired to deliver materials to the roof, the area of the roof without cap sheet that Elite Roofing selected for placement of those materials was necessarily part of the worksite and within its duty to inspect. (See *Acosta v. MAS Realty* (2023) 96 Cal.App.5th, 634, 662 ["[A]lthough Acosta's employer, Horizon, was not hired to inspect or repair the roof hatch, the electrical work for which it was hired required roof access. Because Horizon, through Acosta, chose to access the roof through the roof hatch by means of the fixed ladder, the roof hatch and ladder necessarily were part of the worksite and were within Horizon's duty to inspect."].) Thus, to the extent the roof's unsafe condition was ascertainable

18

as the Parents contend, Elite Roofing was in the best position to discover the hazard because its employees were the individuals who inspected the roof deck *after* Honeycutt began tearing off the cap sheet.

Accordingly, because the Parents identify no evidence sufficient to create a triable fact on either the issue of whether Bryan Industrial/Hoyt knew or reasonably should have known that the roof's plywood constituted a concealed hazard for Elite Roofing workers, or that Elite Roofing could not have reasonably ascertained the plywood's hazardous condition, we agree with the trial court that this exception does not apply.

2.

The Parents' argument that a triable issue of fact exists as to the concealed hazard exception's application to CalCom fails for a different reason. Because CalCom did not own the property where Reyes fell, CalCom was not a "landowner-hirer." And as CalCom contends, the concealed hazard exception to the *Privette* doctrine applies only to landowner-hirers and thus, cannot apply to CalCom. (*Sandoval*, *supra*, 12 Cal.5th at p. 282.)

We are unpersuaded by the Parents' reliance on *Michael v. Denbeste Transportation, Inc.* (2006) 137 Cal.App.4th 1082, 1097 (*Michael*) for the proposition that "[u]nder the *Privette* doctrine, there is no legal distinction between a general contractor and landowner who hires independent contractors; both are 'hirers' within the meaning of the doctrine." The appellate court's statement in *Michael* does not undermine our Supreme Court's later observation in *Sandoval* that the concealed hazard exception to the *Privette* doctrine "applie[s] only to landowner-hirers." (*Sandoval*, *supra,* 12 Cal.5th at p. 282.) Regardless, even if we were to assume that CalCom was subject to the exception, we would still conclude that no triable fact

19

existed as to its application to CalCom for many of the same reasons we found it did not apply to Bryan Industrial/Hoyt.

## C.

The Parents next contend that triable issues of fact exist as to whether Bryan Industrial/Hoyt and CalCom owed Reyes a duty under the retained control exception to the *Privette* doctrine. (See *Hooker*, *supra*, 27 Cal.4th at p. 202.) That exception applies where the hirer "retained control" over the contracted work *and* "negligently exercise[d] that retained control in a manner that affirmatively contribute[d] to the [worker's] injury." (*Gonzalez*, *supra*, 12 Cal.5th at p. 38.) We conclude the Parents fail to show a triable issue of fact on any element of this exception.

## 1.

First, there is no evidence that Bryan Industrial/Hoyt or CalCom retained or exercised control over the reroof project or Reyes' work on it. "[A] hirer's authority over the contracted work amounts to retained control only if the hirer's exercise of that authority would sufficiently limit the contractor's freedom to perform the contracted work in the contractor's own manner." (*Sandoval*, *supra*, 12 Cal.5th at p. 275.) Here, there is no evidence that Bryan Industrial/Hoyt "sufficiently limit[ed]" CalCom's freedom to execute the reroofing project in its own manner, or that Bryan Industrial/Hoyt in any way managed or directed the contractors that CalCom hired for the job. Likewise, there is no evidence that CalCom retained or exercised control over the work of Elite Roofing or Honeycutt. Specifically, there is no evidence that CalCom provided instruction to Elite Roofing about how to deliver the roofing materials, load the roofing materials onto the roof, or perform any other work necessary to the job. There is also no evidence that CalCom instructed Honeycutt on how to tear off the cap sheet roof it was hired to remove.

Finally, it is undisputed that CalCom did not offer or promise Elite Roofing or Honeycutt that it would provide any safety measures related to their work.

The Parents' contentions to the contrary are unpersuasive. They posit that Bryan Industrial/Hoyt retained control by hiring CalCom to perform the reroofing project, by requiring CalCom to remove the two layers of cap sheet, and by selecting the roof system to be installed. To accept this argument, however, would mean broadening the retained control exception to include a hirer's act of defining a particular project for the contractor hired to complete it. Similarly, the Parents allege that CalCom retained control by hiring Honeycutt to remove the cap sheet and by scheduling, or "sequencing," the contractors it hired for the reroof job. Again, the Parents' position requires stretching the retained control exception to impose liability on a contractor for carrying out its contracted work and for hiring other independent contractors to perform aspects of that work. We disagree that this conduct—typical of how contractors function in relation to one another—amounts to retaining control, much less that it qualifies as affirmative conduct. The Parents offer no authorities supporting such broad readings of this exception.

The Parents next theorize that Bryan Industrial retained control by organizing the May 31, 2019 pre-job walkthrough to schedule the roof project and to provide "instructions" to CalCom and Bryan Industrial's maintenance supervisor, Salcedo. The evidence, however, shows that the purpose of the walkthrough was to give the contractors an overview of the property and proposed project, the roof's condition, and the access points—not to control the way that CalCom conducted the reroof work, as the Parents suggest. Although the Parents point to Salcedo's presence at the walkthrough as evidence that Bryan Industrial retained control, Salcedo—Bryan Industrial's

21

maintenance supervisor—testified that he attended the walkthrough merely to learn "what was going to happen" during the reroof project and to complete his limited role of removing fixtures from the roof and marking out where the skylights would be in preparation for the reroof work.  In contrast to the Parents' characterization of Salcedo as "boots on the ground" for Bryan Industrial, there is no evidence that Salcedo was tasked with supervising CalCom's or the other contractors' work.  Tellingly, the Parents again do not identify any authority supporting such broad interpretations of retained control.

As another theory supporting retained control, the Parents contend that because Elite Roofing was not invited to attend the May 31, 2019 walkthrough, we should infer "there was no expectation . . . [Elite Roofing] would have any rol[e] or responsibility for actual work on the roof."  The undisputed evidence, however, shows that CalCom did not hire Elite Roofing until June 4, 2019, *after* the May 31, 2019 walkthrough.  Thus, the Parents' proposed inference is not supported by the evidence.  Moreover, that inference is further undermined by the testimony of Elite Roofing employees regarding their understanding of their role on the project and their roofing experience and training.

Next, the Parents allege that CalCom's installation of a fall protection system after Reyes' accident is evidence of CalCom's control over the jobsite.  First, such evidence is inadmissible to prove negligence as a matter of law.  (See Evid. Code, § 1151 ["When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, *evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event*" (emphasis added)].)  The Parents' reliance on a

distinguishable case that preceded the Supreme Court's creation of the *Privette* doctrine is unpersuasive and does not require a contrary conclusion. (See *Morehouse v. Taubman Co.* (1970) 5 Cal.App.3d 548, 555 [in pre-*Privette* case, post-accident evidence admissible to show defendant's "control of the premises, and as to whose duty it was under the contract to take such safety measures"].) Second, and even if it were admissible, we conclude that evidence of CalCom's actions taken in the months after Reyes' accident are not evidence that, *before* Reyes' accident, CalCom controlled the jobsite. Relatedly, and in contrast to the Parents' arguments, we also see no basis for concluding that CalCom's actions are evidence that Bryan Industrial or Hoyt controlled the jobsite.

We are similarly unpersuaded by the Parents' attempt to show Bryan Industrial/Hoyt's control by arguing that Zeigler of Bryan Industrial controlled the work of a structural engineer, who *CalCom* hired after Reyes' accident to develop a fall protection system for the roof. First, CalCom's hiring of the engineer after Reyes' accident is again an inadmissible subsequent remedial measure. (See Evid. Code, § 1511.) And although the Parents contend that Zeigler's communications with the engineer are evidence that Bryan Industrial/Hoyt controlled the engineer's work, a review of this evidence shows the opposite. In fact, Zeigler was uninvolved in CalCom's hiring of the engineer, and Zeigler met the engineer at the jobsite only to give him access to the warehouse's interior because CalCom did not have a key. There is no evidence that Zeigler directed or managed CalCom's engineer's work in any capacity.

2.

Even assuming there was a triable issue of fact that Bryan Industrial/Hoyt controlled the reroof job, the Parents still fail to demonstrate

a triable issue that Bryan Industrial/Hoyt or CalCom negligently used their purported control in a way that "affirmatively contributed" to Reyes' fall. The Parents identify no affirmative conduct by either Bryan Industrial/Hoyt or CalCom that related to Reyes' fall from the roof. Indeed, neither Bryan Industrial/Hoyt nor CalCom supervised Elite Roofing or any of its employees during their work on the roof. And they did not direct Elite Roofing on how to load the materials onto the roof or where on the roof to load them. In fact, besides Bryan Industrial's maintenance supervisor (Salcedo), no one from Bryan Industrial/Hoyt or CalCom was present at the jobsite when Reyes fell. There is also no evidence that Salcedo retained or exercised control over the work of Honeycutt, Elite Roofing, or CalCom on the day of Reyes' accident or at any other time.

The Parents argue that Bryan Industrial/Hoyt's and CalCom's decisions not to install a fall protection system on the roof before Reyes' fall constitutes sufficient affirmative conduct because they "induced the workers . . . to rely on the apparent strength of the roof." We disagree. California courts have consistently held that a hirer's passive failure to provide safety equipment is not enough to establish the hirer's affirmative contribution to injuries sustained by a contractor's employee, unless there is evidence the hirer or contractor agreed to implement those measures. (See e.g., *Seabright*, *supra*, 52 Cal.4th at p. 594 [hirer's failure to install OSHA-required safety guards did not create liability]; *Delgadillo v. Television Center, Inc.* (2018) 20 Cal.App.5th 1078, 1093 (*Delgadillo*) [hirer did not affirmatively contribute to death of contractor's employee by failing to provide anchor points for window washer's cables].) Here, there is none.

The Parents' evidence does not require a different conclusion. For example, the Parents again point to Bryan Industrial/Hoyt's and CalCom's

24

contract, which includes Bryan Industrial/Hoyt's brief list of tasks required by the project, including, "Provide all necessary equipment to complete the project." Without more, we are not persuaded that this single line item about "all necessary equipment" creates a triable issue that CalCom agreed to provide all *safety measures* for the project, including a fall protection system.

Moreover, for induced reliance to constitute affirmative conduct under the retained control exception, there must be actual direction by the hirer upon which the worker relied. (*Gonzalez, supra*, 12 Cal.5th at p. 47.) In other words, "[t]o be liable, a hirer must instead exercise its retained control over any part of the contracted-for work—such as by directing the manner or methods in which the contractor performs the work; interfering with the contractor's decisions regarding the appropriate safety measures to adopt; requesting the contractor to use the hirer's own defective equipment in performing the work; contractually prohibiting the contractor from implementing a necessary safety precaution; or reneging on a promise to remedy a known hazard in a manner that affirmatively contributes to the injury." (*Id.* at pp. 46–47.) Yet, the Parents identify no evidence that Bryan Industrial/Hoyt or CalCom promised to implement any safety measures, prevented Elite Roofing from taking safety measures it deemed necessary, or prevented Elite Roofing from stopping its work had Elite Roofing felt there was a safety concern. For that reason, there can be no induced reliance amounting to affirmative conduct.

*Madden v. Summit View, Inc.* (2008) 165 Cal.App.4th 1267 (*Madden*) came to the same conclusion about a similar argument, finding that the general contractor-hirer was not liable for injuries suffered by an independent contractor's employee, who fell from a raised patio during construction of a residential home. (*Id.* at pp. 1271, 1276–1278.) The injured

worker claimed the general contractor-hirer was negligent for failing to install a protective railing along the open side of the raised patio. (*Id.* at pp. 1270–1271.) The court held this was insufficient to amount to affirmative contribution, explaining that, although the worker alleged its contractor-employer had no authority to install a protective railing, there was also no evidence that the general contractor-hirer "participated in any discussion about placing a safety railing along the patio, became aware of any safety concern due to the lack of such a railing, or intervened in any way to prevent such a railing from being erected." (*Id.* at p. 1277.) Put another way, there was no evidence that the general contractor-hirer "*directed* that no guardrailing or other protection against falls be placed along the raised patio, or that it acted in any way to *prevent* such a railing from being installed." (*Id.* at pp. 1276–1277.) Similarly, here, there is no evidence that either Bryan Industrial/Hoyt or CalCom directed that no safety measures or fall protection system be implemented, or that it acted in any way to prevent such measures from being implemented.

The Parents complain it would have been expensive and inefficient for Elite Roofing to install a fall protection system on the warehouse's roof. The California Supreme Court has squarely addressed the issue and concluded that this risk is nonetheless delegated to the contractor, explaining: "We acknowledge that there will sometimes be financial and other real world factors that might make it difficult for an independent contractor to raise safety concerns with the hirer or to simply walk away from a job it has deemed to be unsafe. But independent contractors can typically factor the cost of added safety precautions or any increased safety risks into the contract price." (*Gonzalez, supra,* 12 Cal.5th at p. 51.) The same logic applies here. The testimony of Elite Roofing employees about their decision not to

wear fall protection harnesses indicates they understood their role to include making their own safety decisions and that they did not believe the roof was unsafe. Although we acknowledge the expense and difficulty of installing a fall protection system or implementing other safety measures on the roof, Elite Roofing is still presumed under the law to have "factor[ed] the cost of added safety precautions or any increased safety risks into the contract price." (*Ibid.*) Accordingly, we disagree with the Parents that this forms a basis for imposing a duty on Bryan Industrial/Hoyt or CalCom.

The Parents further contend that various state and federal regulations required Bryan Industrial/Hoyt and CalCom to implement certain safety measures at the jobsite, which they failed to do. Under *Privette*, however, Bryan Industrial/Hoyt delegated to CalCom, and CalCom delegated to Elite Roofing, any tort law duty they owed to provide a safe workplace for Elite Roofing's employees. Our conclusion is consistent with caselaw addressing this argument. For example, in *SeaBright*, *supra*, 52 Cal.4th 590, the California Supreme Court addressed whether a hirer could be liable where an employee of an independent contractor hired to maintain and repair a luggage conveyor belt was injured because the conveyor belt lacked the safety guards required by Cal-OSHA regulations. (*Id.* at pp. 594–595.) In finding the retained control exception did not apply, the Supreme Court explained that although the hirer's regulatory duty to install the safety guards preexisted the contract, the hirer delegated to the independent contractor "any tort law duty it owe[d] *to the contractor's employees* to ensure the safety of the specific workplace that is the subject of the contract." (*Id.* at p. 594; see also *id.* at pp. 601, 603.)

Other Court of Appeal decisions have likewise found no hirer liability in circumstances like those presented here. In *Delgadillo, supra,*

20 Cal.App.5th 1078, an employee of an independent contractor fell to his death when his descent apparatus detached from the roof while he was washing a commercial warehouse's windows. (*Id.* at p. 1081.) The plaintiffs submitted evidence that (1) the warehouse's owners had a statutory and regulatory duty to provide approved anchor points on the roof to support window washers; (2) the warehouse contained no such anchor points; and (3) without the anchor points, there was no safe way to clean the windows. (*Id.* at pp. 1083–1084.) The appellate court nevertheless determined the owners owed no duty because, under *SeaBright*, they delegated to the contractor the duty to comply with all statutory and regulatory requirements necessary to provide a safe workplace. (*Id.* at p. 1091.) The court also found that the owners did not exercise retained control over the contractor's work in a manner that affirmatively contributed to the injury because, although the warehouse had inadequate anchor points, the owners did not "suggest or request" that the contractor use them in cleaning the windows. (*Id.* at p. 1093.)

Like *SeaBright*, *Delgadillo* illustrates that even where an unsafe condition exists at a jobsite due to the hirer's failure to comply with specific statutory and regulatory duties, the hirer is not liable because it is the *hired contractor* who is responsible for its own workers' safety. The same logic applies here. Regardless of whether Bryan Industrial/Hoyt and CalCom failed to comply with their regulatory safety duties, they are not liable because it was Elite Roofing who was responsible for the safety of its own workers, including Reyes.

For these reasons, we conclude that no triable issue of fact existed as to the application of either exception to *Privette*, and thus, summary judgment was properly granted in favor of Bryan Industrial/Hoyt and CalCom.

28

IV.

The judgments granting summary judgment are affirmed. Respondents are entitled to recover their costs on appeal.


CASTILLO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.